**In re Stephen COLLINS, Debtor.**
**Bankruptcy No. 93–90226.**

United States Bankruptcy Court,
E.D. Texas,
Beaumont Division.

May 10, 1994.

Robert E. Barron, Nederland, TX, for debtor.

Christopher Naylor, Devlin, Naylor & Walker, Houston, TX, for Ford Motor Credit Co.

## OPINION

DONALD R. SHARP, Bankruptcy Judge.

Comes now before the Court for Confirmation the First Amended Chapter 13 Plan of Debtor Stephen Collins. An Objection to Confirmation has been filed by Ford Motor Credit Company. This opinion constitutes findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052 and disposes of all issues before the Court.

### FACTUAL AND PROCEDURAL BACKGROUND

The facts are not substantially disputed. Stephen Collins ("Debtor") filed for relief under chapter 13 of the Code on February 22, 1993. Debtor owns a 1990 Ford Mercury Cougar automobile in which Ford Motor Credit Company ("Ford") holds a perfected security interest. At the time of filing Debtor owed Ford a remaining balance of $11,037.50 on this automobile.

Debtor's first amended plan has bifurcated Ford's claim into two portions: secured and unsecured. Debtor proposes to pay Ford $8500.00 reflecting the market value of Ford's security interest in the automobile in 48 monthly installments of $203.54. These payments reflect the payment of interest at

the rate of 7% per annum on Ford's allowed secured claim. The remaining portion of Ford's claim is to be paid pro rata as an unsecured claim. Ford's sole objection to this treatment is Debtor's proposal to pay interest at the rate of 7%.

Ford asserts that the appropriate rate of interest to be paid to a secured creditor on behalf of an allowed secured claim in a chapter 13 case is the prepetition rate of interest contracted for by the parties under the terms of the original loan. The terms of the retail installment contract executed between the parties require the payment of 15.50% annual interest. The testimony indicated that Ford relies on a compilation of over 42 risk factors in determining the interest rate required when a buyer wishes to purchase an automobile. In this case, the most significant factors included the Debtor's relatively short time of employment, low down payment, and the age of the automobile financed. Alternatively, Ford requests that the interest rate paid on behalf of its allowed secured claim reflect the prevailing market rate of interest for a loan of this type i.e. a four year old automobile being financed for four years. In the absence of bankruptcy Ford would repossess the automobile and sell it at auction. The proceeds of the sale of the automobile would then be available for financing the purchase of other automobiles. Ford testified that the prevailing rate of interest it receives on such loans is presently 12½%; at the time of the filing of Debtor's petition the interest rate was 13½%. It is undisputed that Ford's cost of borrowing funds is 6.3%.

Debtor contends that the payment of 7% interest more than compensates Ford for the delay in the immediate recovery of the $8500.00 value of the automobile. Expert testimony was introduced which demonstrated that the present value of Debtor's proposed stream of payments to Ford actually had a value of $8,983.00. This present value was reached by discounting the stream of

payments by a discount rate of 4.2%. The discount factor was computed by Debtor's expert economist based on a weighted blend of the prevailing three month treasury bill rate (2.95%) multiplied by a factor of one added to the prevailing three year treasury bill rate multiplied by a factor of three (4.58%). The economist conceded that the 4.2% discount rate reflects the return on a risk-free investment over the term of four years. Debtor asserts that the 2.8% gap rate more than adequately compensates Ford for any risk inherent in the chapter 13 plan. The matter was taken under advisement.

## DISCUSSION OF LAW

It is one of the most basic tenets of economics and business that a dollar in hand today is worth more than the same dollar in hand at some time in the future. This principle is based on the theory that money in hand can be immediately reinvested thereby earning more money. The converse is also true for the longer a party must wait to recover the dollar in prospect only serves to increase the lost opportunity for immediate investment. Therefore, in order to compensate for the delay in payment of this dollar interest must be charged. This is what is known as present value theory. The application of this theory, utilizing a stream of future payments discounted over time, to determine the value of this income stream at any given point in time is known as present value analysis. Section 1325(a)(5)(B)(ii) [1] requires as a condition of confirmation that a chapter 13 debtor pay a nonconsenting creditor the present value of its claim as of the effective date of the plan. Unfortunately, the Code is silent as to the rate of interest which results in the payment of the present value of the secured creditor's allowed secured claim. Not so silent is the case law which has evolved to fill this void.

---

1. _____ the court shall confirm a plan if—

 . . . . .

 (5) with respect to each allowed secured claim provided for by the plan—
 (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

 (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim ...

11 U.S.C. § 1325(a)(5)(B)(ii) (West 1993).

■ Ford directs this Court's attention to a significant body of case law embracing what is known as the "coerced loan theory."[2] *GMAC v. Jones*, 999 F.2d 63 (3rd Cir.1993); *United Carolina Bank v. Hall*, 993 F.2d 1126 (4th Cir.1993); *In re Hardzog*, 901 F.2d 858 (10th Cir.1990); *United States v. Arnold*, 878 F.2d 925 (6th Cir.1989). Under this theory, the advent of bankruptcy not only prevents a creditor from immediately recovering its collateral but forces the creditor to continue a lending relationship with the debtor in the context of the debtor's reorganization. The debtor's continued use of the creditor's collateral under payment terms dictated by the bankruptcy process is viewed as a forced loan—one which the creditor would be unwilling to make under similar terms outside of bankruptcy.

With some exceptions in application, proponents of the coerced loan theory argue that in the absence of bankruptcy the creditor would be allowed to repossess the collateral, liquidate it, and then loan the proceeds at then prevailing market rates of interest.[3] Any resort to present value analysis, therefore, must take into consideration the rate of return in the then existing market for loans of a similar type and character. Only when this market rate of interest is paid through the plan is the creditor receiving the present value of its claim pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii).[4] For reasons to be discussed, the Court declines to follow the coerced loan theory.

■ Distilled to its barest essence, the coerced loan theory is an argument for com-pensating the creditor for lost opportunity costs which result when the creditor is denied the ability to immediately seize and liquidate its collateral. In *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) a similar argument was rejected. In *Timbers*, an unsecured creditor argued it was entitled to relief from the stay because its interest in property of the debtor was not adequately protected pursuant to 11 U.S.C. § 362(d)(1). The basis of the creditor's position rested on the argument that one of the interests in property enjoyed by a creditor consisted of the right to seize the property of a debtor in default and liquidate it. The proceeds of this liquidation could then be used in more immediate investment vehicles. The bankruptcy court agreed and ordered the debtor to pay monthly adequate protection payments to the creditor approximating the return on investment the creditor could expect to receive in the absence of bankruptcy. The district court affirmed. The Fifth Circuit Court of Appeal's reversal of the district court was affirmed by the Supreme Court. The Supreme Court found no basis in the Code for the creditor's position.

■ The *Timbers* case is significant because the concept of adequate protection is closely analogous to the present value debate. In *Timbers*, adequate protection was held not to encompass the prevention of lost opportunity costs on behalf of a creditor. This Court views present value analysis in

---

**2.** The foundation of the coerced loan theory is generally attributable to the Collier treatise's discussion of the concept of present value in chapter 11 reorganizations. *In re Computer Optics, Inc.*, 126 B.R. 664, 671 (Bankr.D.N.H.1991); 5 *Collier on Bankruptcy*, para. 1129.03 at 1129–33 (15th ed. 1993). However, one court has noted the irony in Collier's criticism of the coerced loan theory in the context of present value analysis in chapter 13. *In re Ivey*, 147 B.R. 109, 115–16 (M.D.N.C.1992); 5 *Collier*, para. 1325.06 at 1325–47. This court observes almost all courts which have examined the concept of present value in chapters 11, 12, and 13 treat present value as a universal concept throughout the Code. Cases are not distinguished on the basis of the chapter in which they were filed. This Court's analysis will proceed accordingly.

**3.** Some courts require the payment of the market rate of interest regardless of the specified con-tract rate. *GMAC v. Jones*, 999 F.2d 63, 70–71 (3rd Cir.1993); *United States v. Arnold*, 878 F.2d 925, 929 (6th Cir.1989). Other courts, however, cap the interest rate at the contract rate. *United Carolina Bank v. Hall*, 993 F.2d 1126, 1131 (4th Cir.1993) (Equity requires that the secured creditor recover no more than bargained for).

**4.** However, the coerced loan theory is not supportive of Ford's insistence on receiving its contract rate of interest. The Court notes that the legislative history to § 1325(a)(5)(B)(ii) reveals that Congress considered and *rejected* an amendment which would require the payment of interest at the contract rate for present value purposes. *Matter of Richards*, 106 B.R. 762, 765 (Bankr.M.D.Ga.1989); 5 *Collier on Bankruptcy*, para. 1325.06 at 1325–47 (15th ed. 1993).

much the same way. What § 1325(a)(5)(B)(ii) attempts to remedy is the loss in value of money due solely to the passage of time much as a cost of living adjustment to an employee's wage protects against inflation. Put simply, the concepts of present value and adequate protection are the same, they serve to protect the status quo.

■■■ The application of the coerced loan theory advances rather than preserves the creditor's interest in property. Interest is viewed, not as a time value of money component, but as an investment vehicle with profit as the bottom line. Furthermore, a market rate of interest encompasses costs not relevant to bankruptcy such as the borrower screening, checking credit ratings, and pursuing delinquent borrowers. C. Frank Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L.Rev. 42 (1987). Additional costs include the costs of making the loan and monitoring it.[5] The pursuit of profit and recovery of loan related costs are not relevant to present value analysis in bankruptcy. *In re Connecticut Aerosols, Inc.*, 42 B.R. 706, 709 (D.Conn.1984); *In re Ropt Ltd. Partnership*, 152 B.R. 406, 409 (Bankr. D.Mass.1993); *In re Bergbower*, 81 B.R. 15, 16 (Bankr.S.D.Ill.1987); *In re Fisher*, 29 B.R. 542, 545 (Bankr.D.Kansas 1983).

■■ The proper construction of an interest rate for the purpose of present value analysis consists of determining a base rate of interest reflecting a risk-free loan to which an additional risk factor of interest is added based on the relevant considerations of the case. *In re Fowler*, 903 F.2d 694, 698 (9th Cir.1990) (prime rate plus a risk factor); *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir.1989) (prevailing treasury bond rate plus risk factor). This methodology has previously been adopted by Judge Houston Abel, chief judge for the Eastern District of Texas in *In re Westwood Plaza Apartments*, 147 B.R. 692, 701 (Bankr.E.D.Tex.1992) (adopting the prime rate as a base rate). Furthermore, this court notes that the Fifth Circuit Court of Appeals has recently acknowledged that the use of this approach as "instructive." *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1169 (5th Cir.1993) (Finding that bankruptcy court's adoption of contract rate of 10.25% which was 50% higher than 6.4% rate for risk-free 15 year treasury bonds, while somewhat high, not clearly erroneous). *See also* C. Frank Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L.Rev. 42 (1987) (Finding that the appropriate discount rate is the rate on a government security with a duration equal to some percentage of the reorganization plan's repayment period, plus a one percent risk factor.).

■■■ While convinced that this methodology is appropriate the Court is concerned with the sizable difference between the risk-free rate presented by Debtor and the stipulated cost of Ford's borrowing of replacement funds. As previously stated, expert testimony established that the yield on a blended treasury bill rate for a four year duration equaled 4.2%; Ford's cost of funds is 6.3%. As pointed out by the Carbiener article, the cost of funds to a large creditor and the return on a risk-free investment should differ only to the extent of ½%; the premium such a large creditor pays over the treasury bill rate.[6] Ford did not introduce any evidence to controvert Debtor's calculation of the risk-free rate either in the method of computation or the appropriateness of the rate to be used for a present value calculation. Since the Ford cost of funds figure was a stipulated figure, there was no evidence introduced to demonstrate the methodology by which this cost of funds rate was set. Therefore, the Court has no way to determine why Ford's cost of funds rate appears unduly high. The Court does not believe that the cost of funds rate is a determinative factor in determining the rate that a debtor should pay. It is only some evidence of current interest rates to be referred to as additional guidance for the Court in deter-

---

5. The Court acknowledges that some costs are incurred in bankruptcy. These costs will be discussed at a later point in the opinion.

6. In reaching this conclusion Carbiener relied on the earlier case of *In re Campbell*, 16 B.R. 496 (Bankr.N.D.Ill.1982) which found that Ford's cost of borrowing was ½% over the short-term treasury bill rate. Carbiener, at n. 192.

mining the final rate to be set. In this case, the Court accepts the Debtor's expert's testimony that the 4.2% rate is the appropriate risk-free rate to use in calculating the present value of a stream of future payments.

 Starting with the 4.2% risk-free rate as a base the Court must conclude that the difference between this rate and Debtor's proposed 7% plan rate more than compensates for any risk factor inherent in Debtor's plan. As previously stated, the coerced loan theory was rejected because it contained many risk elements plus a profit factor inappropriate in a bankruptcy context. Unfortunately, the element of risk is not completely eliminated in bankruptcy. Creditors must still monitor the case to protect their rights. Even though the risk of default is reduced due to the feasibility requirements for plan confirmation, the debtor's enhanced motivation to complete the plan, and the role of the trustee in collecting and disbursing plan payments, plans can and do fail. The commentary and case law that have discussed this issue overwhelmingly conclude that an appropriate risk factor must be included as a factor in the discount rate. Determination of an appropriate rate is a difficult question because unlike a lending institution, this Court does not have a lending manual which mechanically guides this analysis[7]. A starting point could be to find the risk-free rate alone sufficient, others, particularly Carbiener, favor a 1% increase to account for the creditor's cost of borrowing and inherent risk, other courts go higher. In *Briscoe*, the court observed that a 3.85% rate above the risk-free rate was equivalent to an extremely high-risk junk bond rate. 994 F.2d at 1169. Against this scale, the Court must conclude that the risks inherent in this case should reflect a risk factor reflective of the lower range of risk. Even factoring in a ½% increase over Debtor's 4.2% risk-free rate still leaves a 2.3% risk factor cushion. This 2.3% cushion is more than ample to compensate Ford for its risk in the instant case[8]. Accordingly, the Court must find that Debtor's plan's provision of a 7% rate of interest on Ford's allowed secured claim provides Ford with the present value of its claim in compliance with § 1325(a)(5)(B)(ii). Debtor's First Amended Plan is Confirmed.

7. Additionally, the risk factor discussed in the commentary and jurisprudence in a case such as this is not the true risk factor that would be determined by a lending institution. The function of the risk factor in the context of a lending institution's rate setting process is that factor which will compensate the lending institution for the inevitable losses it will incur due to defaults in its lending program. That calculation can simply be made by determining the expected rate of default and then factoring an enhanced interest rate charge so that the cost or risk of defaulting loans will be evenly spread among all other loans and the lending institution can determine its expected net revenues from its total loan portfolio. When this type of risk factor is to be determined for one case, it simply becomes inapplicable. The risk of loss in the context of one particular deferred payment transaction is better controlled by tailoring the repayment period to the expected decrease in the value of the collateral. Then, in case of a default, the creditor can recover the remaining value of his claim by securing and disposing of the collateral. It seems to this Court that the enhancement above a risk-free discount factor is more in the nature of an extra payment to compensate the creditor for administration and transaction costs rather than to compensate him for the possibility of default in the scheduled planned payments.

8. It is important to note that in this case the Court is not called upon to fix the exact rate that should be charged. The procedural posture of this case only makes it necessary for this Court to determine whether the 7% rate proposed in the plan is so low as to require adjustment. Therefore, the evidence presented to this Court was not tailored to determining an exact rate plus an exact risk factor but was simply designed to illustrate that the 7% rate was adequate under any set of circumstances. Having found that to be the case, it is not necessary for the Court to determine whether it should adopt a rule of thumb for risk factors to be added to risk-free discount rates or reserve the issue of the appropriate risk factor for a case by case determination. Those issues have not been presented and are not disposed of in this opinion.