### In re WESTWOOD PLAZA APARTMENTS, LTD., Debtor.

#### No. 91–41536.

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.

Aug. 31, 2000.

Joyce Lindauer, Dallas, TX, for Debtor.

Glenn Gillett, U.S. Department of Justice, Washington, DC, for U.S. on behalf of the Department of Housing and Urban Development.

Thomas H. Grace, Liddell, Sapp, Zivley, Hill & LaBoon, Dallas, TX, Berry D. Spears, Winstead, Sechrest & Minick, P.C., Austin, TX, for Asset Recovery Fund, Inc.

George Tarpley, Sheinfeld, Maley & Kay, P.C., Dallas, TX, for Bank Midwest, N.A.

## MEMORANDUM OPINION

DONALD R. SHARP, Chief Judge.

This matter is before the Court on a remand from the United States District Court for the Eastern District of Texas. The plan of reorganization was previously confirmed by the bankruptcy court, the Honorable C. Houston Abel presiding. On appeal to the district court, that opinion was affirmed in all respects with the exception of the rate of interest to be paid on the unsecured portion of the principal debt from Westwood Plaza Apartments, Ltd. to the Department of Housing and Urban Development. The district court determined that the rate provided in the plan of 3 percent per annum on the unsecured portion of the debt was "clearly erroneous" and remanded the case to this Court for determination. Debtor then attempted to modify the plan which this Court denied, holding that the mandate of the district court was to determine the appropriate interest rate before any further action could be taken. That is the matter that is before the Court now for consideration.

An ancillary dispute has arisen since the Department of Housing and Urban Development transferred its rights under the original note and confirmed plan to Asset Recovery Fund, Inc. and Asset Recovery Fund, Inc. (ARF) is now the party-in-interest. Westwood Plaza Apartments, LTD. Objected to Asset Recovery Funds proceeding on the basis that the original note was lost while in the possession of HUD and therefore, ARF could not properly be the holder of the debt and enforce

the rights under the original contract. In oral rulings, this Court overruled that position since the evidence clearly reveals that HUD's rights have all been transferred to Asset Recovery Fund, Inc. and there is no question but that Westwood Plaza was indebted to HUD prior to that transfer. To the extent that the original note may be lost, it is immaterial since there is ample documentary evidence including the plan of reorganization to establish the terms and parameters of the obligation. To the extent that there is any question as to Asset Recovery Fund, Inc.'s standing to pursue this action, this Court holds that it is the proper party to proceed.

In the district court's remand of the proceeding to this Court, the District Court determined that the bankruptcy court had erred in not performing a present value analysis to determine whether the plan proposed by the Debtor provided ARF with payments equaling the present value of its unsecured claim. The District Court specifically held that the same analysis utilized in determining the appropriate interest rate for a secured claim should be utilized for an unsecured claim. The Court analyzed the statutory language and found no substantial difference between the provisions dealing with payments for secured and unsecured claims.[1]

Although the district court did not specifically hold that the 3 percent interest rate was too low, the sense of the opinion convinces this Court that it believed it to be so. The Court only held that the rate was "clearly erroneous" and not insufficient or too low. However, the Court did allude to the fact that feasibility issues would have to be reexamined once a new interest rate was determined because the plan may not be feasible with a "higher interest rate." This Court ruled that the feasibility issue must remain unresolved until the interest rate was determined. To that end a hearing was conducted at which the parties presented evidence concerning the appropriate rate of interest to be charged on the unsecured claim.

At the hearing, the evidence consisted of testimony by an "expert" witness from each side with some charts and documents prepared by the witnesses. Although both parties were aware of the district court mandate to perform a present value analysis, neither party focused on determining the discount rate to be applied to a stream of payments proposed under the plan which would demonstrate that the stream of future payments equated to the present value of the unsecured claim. The expert witnesses focused on the appropriate "market rate" of interest to be applied to an unsecured loan of this type. Both parties conceded that such a loan as this was not available in the market place and therefore, there were no comparable loans one could look to in determining an appropriate interest rate. From a pure economic standpoint, the only criticism one can make of using a "market rate" as the equivalent of a discount rate is that the discount rate is an attempt to determine a future stream of payments that will be the equivalent of the amount of the claim's present value. Obviously, some factor would have to be considered for the risk of non-repayment unless one were talking of a risk free investment. The market rate, on the other hand, is not designed to simply repay the equivalent of the present claim but is a rate calculated by the lender to repay that claim, compensate for the risk of non-repayment and hopefully factor in some profit margin for the lender. It is obvious that neither of these computations is an exact science by simply looking at the myriad of articles and cases discussing the issue.

■ It is obvious that the prevailing jurisprudence, especially in the Fifth Circuit, has determined that the best method

---

1. The Debtor argued at hearing that the district court had incorrectly interpreted the Bankruptcy Code in making this determination. However, that is an issue that the Debtor should have pursued on appeal to the Fifth Circuit rather than on remand in this Court.

for the courts to resolve these issues is to apply an appropriate market rate of interest to determine the amount of the payments to be made to the secured or unsecured lender. *See In re Briscoe Enterprises, Ltd.,* 994 F.2d 1160 (5th Cir. 1993) and *In re Collins,* 167 B.R. 842 (Bankr.E.D.Tex.1994). In the instant case, the appropriate rate of interest on the secured portion of this loan was determined by taking the prime rate and adding to that a certain risk factor to compensate for the risk of non-payment of the loan. The district court specifically approved that methodology and approved the rate that was determined by the Court citing the *Briscoe* case as authority. Also, the district court determined that the methodology for determining the unsecured rate, based on an analysis of the statutory language, should be the same. Therefore, the appropriate procedure for this Court to follow in the instant case is to take the prime rate at the time of the confirmation of this plan and apply to that an appropriate risk factor to compensate for the risk of nonrepayment to establish the proper rate of interest to be applied to the unsecured portion of this loan.

■ The testimony of the Debtor's expert was very difficult to follow and understand. His ultimate conclusion was that a discount or interest rate of 5 percent should be the appropriate rate of interest to be charged. However, his testimony contains inconsistencies and in one instance, a faulty analysis. One of the prime factors that he testified to considering is the question of feasibility. In fact, he argued that he had considered the plan and "looked for a way to make it feasible." There is no support in economic theory or the jurisprudence to tailor the interest rate to a determination of what the Debtor needs it to be to make his plan feasible. Additionally, Debtor's expert conceded that an unsecured loan was inherently riskier than a secured loan and that the increased risk would inherently require a higher interest rate. However, his conclusion is that the maximum rate to be charged on the unsecured portion of the loan is 2–1/2 percent less than the amount being charged on the secured portion. This conclusion defies logic and is totally inconsistent with this acknowledgment that the unsecured portion of the debt carries a higher risk. This Court believes that the fault in the analysis stems from Debtor's beginning point of a treasury bond rate of 7.25 percent which is a riskless rate and then rather than adding points to that riskless rate to compensate for the risk in this case, he lowered the rate by seventy-five basis points because the unsecured portion of the debt shortens the payout term of the original loan by nine years. The fault in that analysis is that the 7.25 percent assumed rate should have first been increased by some factor to compensate for the increased risk and then it may have been appropriate to discount it some amount for the shortened payout period. The Debtor's evidence is too inconsistent *to be given any credibility.* This Court believes that the testimony presented by ARF most closely utilizes the analysis mandated by the district court's opinion as well as the jurisprudence represented by the Fifth Circuit's opinion in *Briscoe.* ARF's expert witness, John Doyal testified that the appropriate rate of interest was prime rate plus two to two and one-half percent for the risk factor of non-payments. Mr. Doyal conceded that this would simply be a loan that was not available on the open market and that there were no comparable market rates to be found. However, he used the methodology sanctioned by the jurisprudence and most commonly used in hearings of this type and that is to take a published rate such as risk free treasury t-bills or the prime rate and add an appropriate risk factor. Obviously, the risk factor is a subjective judgment. As the Fifth Circuit stated in *Briscoe,* "often the contract rate will be an appropriate rate but reference to a similar maturity treasury rate is instructive. The treasury rate is helpful

because it includes all necessary factors except the risk premium." This Court believes that Mr. Doyal made the appropriate analysis and will adopt his testimony as the proper determination of the interest rate to be charged.

The evidence was clear that the prime rate at the time of plan confirmation was six percent. To that rate, Mr. Doyal proposed adding a risk factor of 2 to 2–1/2 percentage points. This determination was based on his knowledge of the commercial real estate market based on long and varied experience he's had. This Court finds that his testimony was very thoughtful and his years of expertise in this area of lending are certainly factors that should give his opinion great weight. Additionally, the analysis creates a logical pattern given both parties' acknowledgment that the unsecured portion should carry a higher interest rate than the secured portion. Since the secured portion carries a rate of 7.5 percent interest and using Mr. Doyal's analysis to add a 2–1/2 percent risk factor to the 6 percent prime rate, one arrives at an interest rate of 8.5 percent on the unsecured portion of the loan creating a logical pattern based on the testimony of all parties.

This Court holds that the unsecured claim constituting class four of Debtor's plan of reorganization must pay ARF, the successor to HUD, interest at the rate of 8.5 percent on the entire unsecured claim.