**UNITED CAROLINA BANK,**
Plaintiff–Appellee,

v.

**Loretta A. Degolier HALL,**
Defendant–Appellant.

No. 92–1807.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 1, 1993.

Decided May 24, 1993.

---

William Earl Brewer, Jr., Raleigh, NC, argued, for defendant-appellant.

Richard L. Burrows, Burrows & Hall, Wallace, NC, argued, for plaintiff-appellee.

Before RUSSELL, NIEMEYER, and WILLIAMS, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

Under Chapter 13 of the Bankruptcy Code, a debtor may gain approval of a debt adjustment plan that provides for the debtor's retaining possession of property securing a loan, despite the objections of the secured creditor, through a "cram down" provision. The "cram down" provision permits the bankruptcy court to approve distribution to the secured creditor of future installment payments equivalent in value to the securing property in lieu of distribution of the property itself. 11 U.S.C. § 1325(a)(5)(B). In determining what amount of installment payments will provide the secured creditor with a value equal to that of its interest in the securing property, the court must include in each installment not only a portion of the value of the secured creditor's interest in the property retained by the debtor but also interest at an appropriate rate to compensate the secured creditor for the delay in receiving the principal amount. We must now decide the deceptively simple question of how the appropriate rate of interest is to be determined when using this "cram down" provision.

## I

On May 20, 1991, Loretta Hall (the debtor) filed a petition seeking adjustment of her debts under Chapter 13 of the Bankruptcy

Code. Her plan of reorganization provided that she retain possession of a 1988 Fleetwood Cottonwood mobile home on which United Carolina Bank held a lien. In return, she was to pay to the Bank the mobile home's then current full value, since the Bank's lien exceeded that value, in 58 monthly installments with 10% interest. The Bank objected to the plan and sought to convert to a Chapter 7 liquidation-of-assets proceeding.

The debtor had purchased the mobile home in November 1987 for $21,200 from a mobile home dealer. She paid $3,000 in cash as a down payment and financed the balance at 13%, agreeing to make 180 monthly payments of $231.57 each. The finance contract was sold by the dealer to United Carolina Bank with recourse. The Bank, as holder of the finance contract, filed a claim for the outstanding indebtedness in the amount of $17,838.95. At the time of the petition, the mobile home was in average condition, and the bankruptcy court established its value at $14,418.40, an amount not challenged on appeal. The court approved a secured claim of the Bank in that amount, leaving the Bank with an unsecured claim of slightly more than $3,000.

The bankruptcy court then approved the debtor's plan and its provision for repayment of the mobile home's value at a rate of 10% in 58 monthly installments of $314.50 each. Taking judicial notice that the prime rate of interest charged by North Carolina banks at the time was 8.5% and determining that the additional 1.5% would compensate the Bank for risk, the court found the 10% proposed rate "appropriate." The court rejected the Bank's contention that the rate of interest allowed should be based on the rates charged by area mobile home sellers. The Bank had presented evidence that the prevailing local rate on sales of new mobile homes was 13.5% and of used mobile homes, 15.5%.

On appeal, the district court rejected the approach of the bankruptcy court in favor of one based on the consumer credit market rate, as advocated by the Bank. The district court acknowledged that the bankruptcy court's approach provided a simplified and easy method of determining the interest rate. It concluded, however, that "the disadvan-

tage is that this approach will probably not accurately reflect the market, and thus may unduly penalize the lender or borrower." The district court held that in the absence of special circumstances, such as a lower contract rate, the bankruptcy court should use "the current market rate of interest used for similar loans in the region." Because the current rate in the market exceeded the 13% contract rate in this case, the district court ordered that the contract rate be used. Under the plan as modified, therefore, the debtor was required to make monthly payments of $336.12. From the judgment of the district court, the debtor appealed.

While this appeal was pending and after the debtor made 20 payments under the plan, the debtor defaulted. At a hearing on December 1, 1992, the Bank and the debtor agreed to a consent order under which the debtor would be given an opportunity to cure an arrearage of $2,033.47 by making an immediate payment of $500 and thereafter four bi-weekly installment payments of $427.12 each, beginning December 11, 1992. The order also provided that if payments were not made within five days of the date when due, the automatic stay would be lifted. The debtor was not able to meet the terms of the consent order. Her first three payments, although ultimately made, were not timely: The first was 27 days late, the second 23 days late, and the third 12 days late. The automatic stay was therefore lifted in accordance with the terms of the consent order. The debtor has since filed a motion to reimpose the stay and further proceedings are pending as we decide this case. On the basis of these post-appeal developments, the Bank contends that the appeal is now moot and should be dismissed.

**II**

 Before considering the merits of this case, we must first address the Bank's motion to dismiss the present appeal for mootness. The Bank contends that the appeal is moot because the debtor has defaulted under the approved plan and the automatic stay has been lifted. It contends that therefore it is now entitled to proceed with foreclosure and recover immediately the full amount of its

allowed claim. The Bank argues further that its recovery is not capped at $14,440 but that it may retain all proceeds of sale up to the extent of the indebtedness that remains after credit is given for payments already made. *Cf. Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992) (holding in a Chapter 7 case that because the secured creditor's lien remains intact until foreclosure, the creditors claim is not capped by the value of the property established by the bankruptcy court). It maintains that whether the payments it received under the plan were too high is irrelevant so long as total recovery does not exceed the allowed claim.

The debtor contends that since 20 payments were made under the approved plan and the amounts of those payments were calculated on the basis of a 13% interest rate, it continues to be important both to the debtor and to the unsecured creditors whether the appropriate rate of interest was charged and whether the Bank overcollected under the plan at the possible expense of other creditors.

We note first that the reimposition of the stay remains to be decided. But even if the stay remains lifted, the bankruptcy court has not yet determined the full amount of the Bank's allowed claim. The Bank's assumptions fail to include the possibility that a foreclosure sale will not realize sufficient funds to cover its claim as determined. Most importantly, however, in arguing that the lifting of the stay in and of itself moots its appeal, the Bank has overlooked the rights of other creditors at earlier stages of the Chapter 13 proceeding.

Before the debtor's default, the Bank was entitled to payments which compensated it only for the present value of its allowed secured claim. Payments in excess of that amount would have adversely affected other creditors, as the resources available in a Chapter 13 proceeding are finite. Other creditors could claim that even with the debtor's default, the Bank would not be entitled to retain payments in excess of that which should have been made before the default. They would argue that by diverting improperly a portion of the debtor's cash flow, the Bank denied them amounts that they would have received before default, reducing the recovery on their claims. This is illustrated by the facts before us. The debtor made 20 payments to the Bank under the plan approved by the district court, for a total of $6,722.40. If the rate determined by the bankruptcy court had been applied, those 20 payments would have totaled $6,290, $432.40 less than the Bank collected. Thus if the district court erred, the Bank has received $432.40 in pre-default estate resources which otherwise could have gone to pay other creditors.

In the overall circumstances, therefore, we cannot agree that the issue presented on appeal is moot, and we will proceed to decide the appropriate rate of interest to be charged under the "cram down" provisions of 11 U.S.C. § 1325(a)(5)(B).

## III

■ Chapter 13 of the Bankruptcy Code was enacted to provide individual borrowers who have a regular source of income a means to adjust their debts through reliance on a stream of *future income.* The chapter recognizes that the extension of consumer credit depends more on the borrower's capacity to pay debts out of future income than on the value of the collateral provided, because personal property generally loses most of its resale value upon use. It thus allows a reorganization of an estate that includes future income with the expectation that greater payment should result to the creditors than would result from a liquidation of an existing estate. To take advantage of the chapter's benefits a debtor must submit a plan that includes a feasible budget for the orderly payment of creditors from future income under the continuing jurisdiction of the bankruptcy court. At the same time, a plan must insure that the creditors receive no less than they would under Chapter 7. 11 U.S.C. § 1325(a)(4) & (5)(B). In a Chapter 7 proceeding, the secured creditor would recover the value of its security interest in the property from the proceeds of a foreclosure sale. Because payment under a Chapter 13 plan is spread out over three to five years, *see* 11 U.S.C. § 1322(c), the cost of this delay must

be included in payments or the secured creditor will not receive the value of its security interest that would be realized under a Chapter 7 liquidation.

■ When a secured creditor objects to a plan, Chapter 13 provides two alternative courses. The debtor may either surrender the securing property to the secured creditor or, under the "cram down" provision, the debtor may retain possession of the property by (1) recognizing the secured creditor's lien, and (2) providing for payments to the secured creditor that total not less than the value of the lien. If the secured creditor is undersecured, the total must be not less than the value of the securing property at the time the petition is filed.* If the plan provides for installment payments from future income, as would be the usual case, the total amount of payments must have a *present value* equal to that of the lien. Accordingly, interest must be included at a rate that compensates the creditor for the delay in receiving the value it would have received more promptly if the debtor had surrendered the collateral under § 1325(a)(5)(C). The issue presented in this case is how to calculate the appropriate rate of interest to pay the secured creditor.

The debtor contends that the district court erred in reversing the bankruptcy court's use of a 10% interest rate (representing an 8.5% prime rate component and a 1.5% credit risk component). Although the district court recognized the bankruptcy court's rule as useful because of its simple application, it concluded that because the rate did not reflect market conditions, the secured creditor might be undercompensated and therefore penalized by use of the rule. We agree.

When it is recognized that the purpose of including interest as part of the installment payments is to place the secured creditor in the same economic position as if the debtor had surrendered the collateral to the secured creditor, the issue of how the applicable interest rate is to be calculated becomes essentially an economic one. Nevertheless, the courts have continued to grapple with the appropriate formulation.

Some courts have suggested that the secured creditor be paid based on the rate at which the secured creditor borrows money, on the assumption that the secured creditor can replace the money tied up in the bankruptcy proceedings and then make new loans to consumers at the then prevailing rates in that market. *See, e.g., In re Fowler*, 903 F.2d 694, 697–98 (9th Cir.1990); *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir.1989); *In re Oaks Partners, Ltd.*, 135 B.R. 440, 445–46 (Bankr.N.D.Ga.1991); *In re Jordan*, 130 B.R. 185, 192 (Bankr.D.N.J. 1991); *In re Hudock*, 124 B.R. 532, 534 (Bankr.N.D.Ill.1991); *see also* 5 *Collier on Bankruptcy*, § 1325.06[4][b][iii][B], at 1325–45 (Lawrence P. King, 15th ed. 1992). A major difficulty with this approach, often referred to as the cost of funds approach, however, is its underlying assumption that the secured creditor has an unlimited supply of credit. When it is recognized that every secured creditor has a limited amount of credit on which to draw, then it follows that utilizing some of that borrowing capacity without providing the secured creditor with the usual return on its capital produces a loss for the secured creditor. This loss is measured by the difference between (1) the interest it could have earned in the then current market for loans similar to that to the debtor, less the cost to it of making such a loan, and (2) its cost of borrowed capital. In general, we believe that looking to the rate at which a secured creditor borrows funds presents too great a risk that the payments will not provide a fair present value.

■ Therefore we conclude that it is fairer to treat the value of the collateral retained by the debtor under the "cram down" provision of Chapter 13 as a new loan and to match its rate of return to the secured creditor with that which the creditor would otherwise be able to obtain in its lending market. We

---

* The statute provides that the court shall confirm a plan only if as to each allowed secured claim "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). Here, the creditor was undersecured, so the value of its lien equals the value of the collateral. *See* 11 U.S.C. § 506(a).

have previously tacitly indicated our approval of this approach, *see In re Bryson Properties,* 961 F.2d 496, 500 (4th Cir.1992), and this approach seems to have been adopted by at least two other circuits, *see In re Hardzog,* 901 F.2d 858, 860 (10th Cir.1990) (the court should look to the market of similar loans in the area); *Memphis Bank and Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982) (same). It is also the approach that the district court took.

While we hold that the business opportunity that the secured creditor might otherwise have been able to pursue best determines the present value of the allowed secured claim, and therefore that the district court properly looked to the Bank's lending market in setting an interest rate, we note that the court must be wary of placing the secured party in a better position than that in which it would have been if the debtor surrendered the collateral. We note, for example, that if the collateral had been surrendered, the Bank would have incurred the expenses of liquidating the collateral and of making a new loan in the marketplace. The market practice demonstrated by the evidence in this case is that local mobile home dealers initially incur the expense of placing the loans. The banks then purchase the paper from the dealers at a discount, thus compensating the dealers for this expense. While the evidence showed that mobile home dealers were collecting 13.5% interest for the financing of new mobile homes and 15.5% for used mobile homes, the Bank might be receiving less. If the Bank generally makes the loan directly to consumers, the interest rate it collects, adjusted for its expenses, may be used to determine the appropriate rate of interest under the "cram down" provision. But if the Bank generally purchases the finance contracts, the rate reflected by the discounted purchase price is used. In neither case, however, is the gross rate of interest paid by consumers for similar loans used without accounting for the Bank's expenses.

Thus, in determining the appropriate amount of interest to pay the secured creditor under the "cram down" provision of Chapter 13, we reject a rule which realizes to the secured creditor only its cost of funds.

Rather, we adopt a rule that looks to the secured creditor's lending market in determining what rate of interest best provides the secured creditor with its present value, taking into account not only the rates which it obtains from similar loans in the area but also its expenses in obtaining those loans, either by its own underwriting or in its purchases from dealers.

Finally, so as to eliminate a windfall benefit to the secured creditor, the district court capped any interest rate used in the "cram down" situation at the contract amount to which the secured creditor had originally agreed. *See In re Mellema,* 124 B.R. 103, 107–08 (Bankr.D.Colo.1991). As a matter of equity, we agree with that limitation.

For the reasons given, we affirm the judgment of the district court.

*AFFIRMED.*