AMERICAN GENERAL FINANCE,
INC., Appellant,

v.

Donald KLEINKNECHT and Peggy
Kleinknecht, Appellees.

No. 3:98–CV–67 DF.

United States District Court,
M.D. Georgia,
Athens Division.

Feb. 8, 1999.

Lynne D. Perkins–Brown, Madison, GA, for appellees.

Robert W. Broome, Atlanta, GA, for appellant.

Camille Hope, Macon, GA, trustee.

FITZPATRICK, Chief Judge.

Presently before the Court is an appeal by American General Finance, Inc., from a decision of the United States Bankruptcy Court for the Middle District of Georgia, Athens Division. The primary issue on this appeal involves the question of what interest rate a creditor is entitled to as part of a "cram down" under Chapter 13 of the United States Bankruptcy Code. For the reasons that follow, this Court believes that the Bankruptcy Court used an acceptable method for selecting the applicable interest rate in a Chapter 13 cram down, and for that reason, the decision of the court below is hereby affirmed.

## I. *Background*

Appellee, Donald Kleinknecht, obtained a loan of $6,760.59 from Appellant on February 26, 1997. The terms of the loan required Appellee to repay the loan by making thirty monthly payments in the amount of $298.06. The rate of interest on the loan was 22.9 percent. As collateral, Appellee pledged a 1996 Mitsubishi Galant valued at over $11,000.00. Appellee then made his first five payments pursuant to the terms of the agreement.

Because of financial problems, however, Mr. and Mrs. Kleinknecht filed a joint petition for relief under Chapter 13 of the Bankruptcy Code on October 3, 1997. Appellant filed a proof of claim in the amount of $6,137.88. Appellees, as part of their proposed plan of reorganization under Chapter 13, offered to pay Appellant's claim in full plus twelve percent interest over a term of four years. Appellant, however, objected to this plan, claiming that it should receive its full contract rate of interest (22.9 percent) in order for the Chapter 13 plan to be confirmed.

Over the objections of the Appellant, the Bankruptcy Court confirmed Appellee's Chapter 13 plan and permitted Appellee to remain in possession of the collateral in exchange for their agreement to repay the balance of the principal plus 12 percent interest over a four year period. Appellants now ask this Court to reverse the Bankruptcy Court's decision confirming the plan.

## II. *Standard of Review*

In reviewing a decision of a bankruptcy court, the district court must accept the bankruptcy judge's findings of fact unless they are clearly erroneous. *See* Fed. Bankr.R. 8013; *see also In re Chase & Sanborn Corp.*, 904 F.2d 588, 598 (11th Cir.1990). A bankruptcy court's conclusions of law, on the other hand, are subject to *de novo* review. *See id.*

## III. *Discussion*

Chapter 13 of the bankruptcy code offers relief for debtors who maintain regular incomes. Although limited by a strict debt ceiling, Chapter 13 provides voluntary relief for those individuals who wish to reorganize their debts Without obtaining creditor approval. Although secured creditors do not get to vote on Chapter 13 plans, their Fifth Amendment property interests are addressed in Chapter 13 by 11 U.S.C. § 1325(a)(5)(b). *See* 5 *Norton Bankr. L. & Prac. 2d* § 122.8 (1998) (recognizing § 1325(a)(5)(b) as a "constitutionally imposed limitation of the power of a Chapter 13 plan to modify the rights of a secured claim holder"). Thus, if a debtor wishes to remain in

possession of the secured property as part of his Chapter 13 reorganization plan, he must either (a) obtain the creditor's approval or (b) satisfy the requirements of § 1325(a)(5)(B), Chapter 13's "cram down" provision.[1]

Section 1325(a)(5)(B) requires a Court to confirm a Chapter 13 reorganization plan involving a secured claim so long as:

(i) the plan provides that the holder of such claim retain the lien securing such claim; *and*

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim....

11 U.S.C. § 1325(a)(5)(B) (emphasis supplied). The claim in the instant case is oversecured: the value of the collateral is approximately $11,000.00 while the outstanding claim itself is only $6,137.88. The issue now before the Court is whether Appellee's proposed plan of payments satisfies the requirements of Chapter 13's cram down provision. In answering that question, two further questions arise. First, what is a creditor entitled to under § 1325(a)(5)(B)(ii): is the creditor merely entitled to the value of its claim or is it also entitled to the profits it might have made had the secured property been liquidated on the effective date of the plan. Second, did the court below err in selecting an interest rate that would compensate Appellant for the present value of its claim. These questions will be considered in turn.

A. *What is a Creditor Entitled to Receive in a Chapter 13 Cram Down?*

■ Before a court can select an interest rate that is sufficient to compensate a creditor for the present value of its claim, it must first decide exactly what the creditor's claim entails. Everyone agrees that if a debtor owes a creditor $3,600.00, and the debtor wishes to repay his debt over the course of three years, that debtor must do more than

simply make 36 monthly payments of $100.00. Under § 1325(a)(5)(B), the creditor is at the very least entitled to be compensated for the fact that payments are being deferred. Thus, in the example above, the debtor's proposed payments would have to be capitalized to account for the time value of money (the common sense proposition that a dollar today is worth more than a dollar in the future).

Courts disagree, however, as to how the issue of lost profits should be resolved under § 1325(a)(5)(B). Typically, a lender making a loan will attempt to recapture not only the cost of the loan (including any anticipated inflation), but also a profit as well. Consequently, courts interpreting § 1325(a)(5)(B) must decide whether a creditor is entitled to the value of its claim as adjusted to account for the deferred payments or whether the creditor is also entitled to the value of any opportunities lost because of the deferred payments.

■ Neither the case law nor commentary addressing this issue provide a clear answer as to how this matter should be resolved. The courts and commentators that argue against taking profit into consideration seem to be proceeding from the mistaken premise that Chapter 13's cram down provision is merely designed to protect a creditor's property interest. *See e.g. In re Hudock*, 124 B.R. 532, 534 (Bankr.N.D.Ill.1991) ("The Bankruptcy Code protects the creditor's interest in the property, not the creditor's interest in the profit it had hoped to make on the loan."); *In re Jordan*, 130 B.R. 185, 189 (Bankr.D.N.J.1991). In a cram down, however, the creditor does not seek to protect its property interest, it seeks payment for its claim. *See* Epstein, *supra* at 453. The acknowledged purpose of § 1325(a)(5)(B) "is to place the holder of an allowed secured claim in the same position economically as if the debtor exercised the option of surrendering the collateral."[2] 8 *Collier on Bankruptcy*

---

**1.** A "cram down" is said to occur when a bankruptcy court confirms a plan of reorganization without the creditors consent. The plan is said to be "crammed down" over the creditor's objection. *See* David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates,*

49 Ala.L.Rev. 435, 437 (1998). This term or art is used as a compound word by some while others separate into two parts ("cramdown" versus "cram down"). *See id.* at 437 n. 4.

**2.** There is no persuasive reason for construing the cram down provisions in Chapter 11 and

§ 1325.06[3][b] at 1325–35 n. 104 (Lawrence P. King et al. eds., 15th ed. rev.1998); *see also In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 652 (11th Cir.1983)

If one accepts that premise, then lost profits must be taken into consideration. It simply makes no sense to say that a creditor is entitled to be put in the same position it would have been had the collateral been surrendered and at the same time argue that lost profits should not be considered in discounting the deferred payments. Yet, courts continue to take these two mutually exclusive positions. For instance, in *General Motors Acceptance Corp. v. Valenti,* 105 F.3d 55, 63–64 (2d Cir.1997), the court made the following statements about Chapter 13's cram down provision:

> The objective of section 1325(a)(5)(B)(ii) is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately. The purpose is not to put the creditor in the same position that it would have been in had it arranged a "new" loan.

As one commentator has noted, these two sentences are irreconcilable. "In *Valenti,* if GMAC had 'received the value of its allowed claim' immediately, it would have used the funds it received to arrange a new loan to some third party. GMAC's return from that new loan would reflect not only GMAC's cost of funds but also its other costs and risks and a profit." Epstein, *supra* at 457–58.

■ Consequently, if a court truly wishes to leave a secured creditor in the same position that it would have been in had the collateral been surrendered, that court must take lost profits into consideration when calculating the appropriate interest rate in a Chapter 13 cram down. "The cram down interest rate should reflect what the secured creditor would have earned had it taken that cash and reinvested it in loans with terms comparable to the terms proposed by the debtor's plan and with risks comparable to the risks presented by the debtor's nonpayment." *See id.* at 468. Given that a court should consider the lender's anticipated profits, the next question is how should a court

select an interest rate that will fulfill this purpose.

**B.** *Did the Bankruptcy Court Select an Appropriate Interest Rate to Compensate the Appellant for the Present Value of Its Claim?*

Three different methods of selecting a cram down interest rate have emerged from the numerous cases and comments that have addressed this issue. The first method relies on a "coerced loan" theory, whereby a bankruptcy court uses the current market rate of interest for a similar loan in the region. The theory behind this approach is that the creditor is being forced by Chapter 13 to make a new loan to the debtor. Proceeding on that premise, the courts that have adopted this approach argue that the creditor should receive the same interest rate that any other creditor in the market would receive if such a loan were made to the debtor. Under this approach, the contract rate is often used as evidence of the prevailing market rate. *See e.g. General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 70–71 (3d Cir.1993); *Green Tree Financial Servicing Corp. v. Smithwick,* 121 F.3d 211, 214 (5th Cir.1997). The second approach is known as the "cost of funds" approach. Under this view, a court should endeavor to select a rate that will compensate a creditor for the expenses it incurs when it has to borrow money for new loans because of the debtor's deferred payments. The theory behind this approach is that the creditor can then use these replacement funds to issue a new loan to another debtor. *See generally* Michael S. Frankel, Comment, *The Emerging Fixed Cramdown rate Regime: A Market-driven Argument for Effective Fixed rates in Bankruptcy Cramdown,* 2 U.Chi.L.Sch. Roundtable 643, 646–48 (1995). Finally, other courts use a "formula" method, where some risk-free rate, such as a U.S. Treasury Bond or the prime rate, is used as a baseline from which a risk premium is added to reflect the characteristics of the particular debt. *See generally id.* at 649–51.

---

Chapter 13 differently because both provisions use the phrase "value, as of the effective date of

the plan." *See* Epstein, *supra,* 49 Ala.L.Rev. at 446–47.

In choosing between these alternatives, the Court must be mindful of the purpose of § 1325(a)(5)(B), which is to put the creditor in the same position that it would have been in had the collateral been surrendered. The cost of funds approach does not adequately fulfill this purpose. First, it ignores the fact that a creditor does not have an unlimited supply of credit. *See United Carolina Bank v. Hall*, 993 F.2d 1126, 1130 (4th Cir.1993). Second, inefficient lenders that fail to diversify their portfolios will be able to charge higher rates than more efficient lenders because their costs of capital will be higher. The result is that the inefficient lender with higher capital costs will be able to charge more than the efficient lender despite the fact that both possess claims with similar risks. *See* Frankel, *supra* at 647.

The other two approaches, the coerced loan theory and the formula method, come closer to fulfilling the purpose of § 1325(a)(5)(B). Although courts generally treat these two approaches as separate and distinct, in reality, they have much in common. *See In re Villa Diablo Assocs.*, 156 B.R. 650, 653 (Bankr.N.D.Cal.1993) (recognizing formula approach as an alternative method of selecting a market rate where a market does not otherwise exist). Both allow anticipated profits to be taken into consideration. With the formula approach, the anticipated profits of the lender can be considered by selecting some low-risk rate, such as the prime rate. The prime rate of interest is a rate that commercial lenders charge large institutional investors with the highest credit standing. *See* Waltraud S. Scott, Comment, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter Of Interest*, 63 Wash.L.Rev. 1041, 1048 n. 41 (1988). Included in the prime rate is the profit the lender hopes to make for issuing such a loan (otherwise known as the "real" rate of interest). *See id.* at 1047. By contrast, under a coerced loan theory, a court would look to what another lender in the region would charge for a similar loan, and that rate would presumably incorporate the lender's expected profit.

The primary difference between these two approaches is how the risk factor is calculated. Using the coerced loan approach, the risk factor is incorporated into the rate that another lender in the region would charge for a similar loan to someone in the debtor's position. *See id.* at 1056. Under the formula method, a court looks at several variables, including whether and how much of an equity cushion exists and whether the collateral is insured or is likely to depreciate. *See In Re Gramercy Twins Assocs.*, 187 B.R. 112, 123–24 (Bankr.S.D.N.Y.1995). Both methods have drawn a fair amount of criticism from courts and commentators.

Critics of the coerced loan analysis argue that it is an unrealistic method of selecting a cram down interest rate that invariably leads to the lender being put in a more favorable position than it would have been had the collateral been surrendered. Because bankrupt debtors could not obtain a loan in the market in light of their credit problems, these critics argue that it makes no sense to estimate the rate a hypothetical lender would charge for such a loan. *See* Hon. John K. Pearson et al., *Ending the Judicial Snipe Hunt: the Search for the Cramdown Interest Rate*, 4 Am.Bankr.L.Rev. 35, 47 (1996) (noting that in "no reported case has a court concluded, based on evidence presented, that any actual market exists in which a lender makes loans to debtors under the circumstances which generally prevail in reorganization."). Furthermore, if the market rate is based on the contract rate (as is often the case), the lender might actually be better off under the Chapter 13 reorganization because no additional transaction costs would be incurred:

> [I]n consumer finance transactions in which annual percentage rates are relatively high, the primary factors determining those rates do not relate to risk, especially when the debt is secured, but to high costs of marketing, high transaction costs relative to the amount of debt, and consumers' failure to effectively shop for lower rates due to various imperfections in the market.

8 *Collier on Bankruptcy* § 1325.06[3][b] at 1325–37–38. Furthermore, critics of the coerced loan analysis argue that it is inconsistent with congressional intent because Congress expressly rejected an amendment

to the Bankruptcy Code in 1984 that would have required the contract rate of interest to be paid under § 1325(a)(5)(B)(ii). *See id.* at 1325–37 (citing H.R.1985, 98th Cong., 1st Sess. § 19(2)(A) (1983); H.R.1169, 98th Cong., 1st Sess. § 19(2)(A) (1983); H.R.4786, 97th Cong., 1st Sess. § 19(2)(A) (1981)).

■ The congressional intent argument is unpersuasive. The Congress that rejected the amendment in question in 1984 was not the same body that passed the 1978 revisions to the Bankruptcy Code. As the Supreme Court has recognized, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960); *see also Fogarty v. United States,* 340 U.S. 8, 13–14, 71 S.Ct. 5, 8, 95 L.Ed. 10, (1950) (rejecting the notion that the Court can infer congressional intent from a subsequent Congress's failure to enact a particular piece of legislation). With respect to the argument that a creditor is placed in a better position because it incurs no additional transaction costs, there is no reason that the market rate could not be reduced accordingly. *See United Carolina Bank v. Hall,* 993 F.2d 1126, 1131 (4th Cir.1993) (recognizing that costs of a new loan must be deducted from market rate for a similar loan in determining cram down interest rate). The most cogent criticism of the coerced loan approach is the notion that a market for such loans does not exist. Because a debtor would probably be unable to secure a loan in the open market, a court can only estimate what rate a creditor would charge if such a loan was made by a commercial lender. *See* Pearson, et al., *supra* at 46–47. That same problem, however, exists for courts using the formula method. The courts that use that approach rarely have an objective basis for the "risk premiums" they add to their base rates. *See* Jack Friedman, *"What Courts Do to Secured Creditors in Chapter 11 Cram Down,"* 14 Cardozo L.Rev. 1496, 1521 (1993) (noting that "[n]ot one of the reported decisions, discussing what "risk factor" should be added to a base rate, has even analyzed the probability and magnitude of actual risk."). In either case, a certain amount of judicial guesswork seems inevitable.

■ Consequently, this Court believes that either approach is an appropriate method of selecting the applicable rate in a Chapter 13 cram down, so long as the bankruptcy court gives appropriate consideration to all relevant factors. In the instant case, the court below, using the formula approach, felt that a 12 percent rate of interest, where the prime rate was 8.5 percent, was sufficient to compensate the lender for the present value of its claim. The lender here argues that if were to obtain the collateral and liquidate it, it would then issue a new loan to another borrower at a 22 percent rate of interest.[3] Even if that is so, that fact fails to show how the Defendant would be better off if the collateral was surrendered. It is possible that the risks involved with such a loan would be similar to those in the instant case, and it is also entirely possible that the transaction and marketing costs that would go into making a new loan would counterbalance the higher rate of interest.

Ultimately, the Court's task here is to decide whether the court below clearly erred in adopting the 12 percent rate. This Court cannot say that it did. The prime rate of 8.5 percent compensates Appellant for the cost of borrowing additional funds as well as any lost profits it would have made on another loan. And in light of the fact that a signifi-

---

3. Appellant also relies on a recent Supreme Court decision, *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), to argue that the interest rate it would charge in a new loan should be used in assessing the cram down interest rate. *Rash,* however, was a case that focused on statutory language not involved in the present case, and consequently, the holding of that case has no bearing in the present dispute. *See generally* Epstein, *supra,* 49 Ala.L.Rev. at 460–62. Appellant also claims that it was unfairly discriminated against because other creditors received their contract rate of interest. This contention is patently frivolous. The reason Appellee was willing to pay the contract rate in the other two cases was because the rates were 8.25 percent and 12 percent respectively. Obviously, any debtor would prefer to pay the contract rate of interest when that rate is relatively low. That truism, however, does not suggest any desire on the debtor's part to discriminate against a particular creditor.

cant equity cushion exists in this case, and the fact that the collateral is insured, the Court cannot say that a risk premium of 3.5 percent is too small. Accordingly, the decision of the United States Bankruptcy Court for the Middle District of Georgia, Athens Division, is hereby **AFFIRMED.**

SO ORDERED.