### In re BYRD FOODS, INC.

### No. 96–27583.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

July 14, 2000.

Ross C. Reeves, Norfolk, VA, for Debtor.

## MEMORANDUM OPINION AND ORDER

DAVID H. ADAMS, Bankruptcy Judge.

This case comes before the Court upon the Committee of Unsecured Creditor's Motion for Judgment on Partial Findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, applicable pursuant to Rules 7052 and 9014 of the Bankruptcy Rules. This a is a core proceeding, and jurisdiction in this Court is proper under 28 U.S.C. § 157(b) and 28 U.S.C. § 1334.

### FINDINGS OF FACT

A hearing on the confirmation on the debtor's Second Plan of Reorganization was held on March 27, 2000. The relevant

portion of debtor's second plan calls for unsecured creditors to be paid 100% of their allowed claims in installments, evidenced by the issuance of notes bearing interest at the rate of 10%, with the obligations becoming due and payable in full on December 31, 2005. During the hearing, the Court heard evidence as to whether the plan meets the requirements for confirmation set forth in § 1129 of the Bankruptcy Code.

The Unsecured Creditor's Committee presented the testimony of two witnesses. James L. Hewitt of the McShane Group testified on the issue of feasibility, stating that debtor's forecasts as to future cash flow were uncertain and that any projections as to debtor's business are suspect due to volatility in price and yields and due to inadequate cash on hand. Hewitt testified that it was more likely than not that all plan payments could not be made when due. Harold Williams, of Riverside Capital, also testified on behalf of the Committee as to the proper interest rate to be paid on the unsecured creditors' claims. Mr. Williams testified that there were essentially three components to the assessment of a loan's risk: business, financial and restructuring. Mr. Williams was of the opinion that a hypothetical lender would demand an interest rate of 18 to 22%. The debtor pointed to Mr. Williams' lack of farm loan or agricultural lending experience and failure to consult with anyone with the debtor's organization in coming to his conclusions. The Court held that Mr. Williams could not qualify as an expert witness in this case due to his lack of familiarity with farming operations, but allowed him to proffer his testimony for the record.

The debtor presented the testimony of Gary Stewart, the debtor's designated representative, who testified about the current and projected financial condition of Byrd Foods as it related to plan feasibility. The debtor also presented a page from the Bloomberg Financial News website indicating the yields on five and ten year U.S. Treasury issues as of March 24, 2000 and an issue of *The Wall Street Journal* published the day before the hearing. Both of the debtor's exhibits were admitted into evidence without objection. Mr. Stewart testified that the debtor would henceforth only be farming tomatoes, which history has shown to be more profitable to the debtor than other crops, and that the customer base for the tomatoes, which includes buyers in the Northeastern United States, Canada and Puerto Rico, appears to be broad based. With respect to future capital expenditures, Stewart testified that the debtor was no longer pursuing an irrigation system for newly acquired land and that no new equipment would need to be purchased for the foreseeable future. While acknowledging poor results in some of the prior years, Stewart pointed to drought and a drop in tomato prices as the causes of previous years' losses.

The Committee of Unsecured Creditors made its Motion for Judgment on Partial Findings after presentation of the evidence, based upon the debtor's failure to satisfy its burden of proof in showing that the interest rate provided in the plan for unsecured creditors afforded those creditors "value" equal to the allowed amount of their claims. The Committee argues that the debtor did not provide "creditor specific" expert testimony on the market rate of interest required by the case law in this jurisdiction. Brandt Consolidated, Inc., one of debtor's unsecured creditors, supported the Committee's motion. The Court took the matter under advisement to determine whether the debtor met its burden of proof on the issue of providing value to the unsecured claimants in the case.

## CONCLUSIONS OF LAW

Judgment as a matter of law pursuant to Rule 52(c) is appropriate when, "without weighing the credibility of witnesses, there can be but one reasonable conclusion as to the correct judgment ... If, however, evidence viewed in a light most favorable to the nonmovant indicates that more than

one conclusion is plausible, judgment as a matter of law is improper."[1] *Siegfried Construction, Inc. v. Gulf Ins. Co.*, 2000 WL 123944 (4th Cir.2000). The Court must therefore decide, viewing the evidence presented in a light most favorable to the debtor and without judging the credibility of the witnesses, whether the debtor's evidence of the rate of interest offered to the unsecured creditors is sufficient to meet the debtor's burden of proof.

■ It is well established that it is the debtor's burden to show that the plan meets the statutory criteria. The debtor must demonstrate by a preponderance of the evidence that its plan meets all the requirements of the Code. *In re DeLuca*, 1996 WL 910908 (Bankr.E.D.Va.1996). We shall address the discreet issues of valuation and the debtor's corresponding burden of proof in this ruling on the Committee's motion.

■ The primary thrust of the Committee's motion is that the debtor did not carry its burden of proving that the unsecured creditors are to receive a market rate of interest on their claims as required by Bankruptcy Code § 1129. The Committee asserts that the standard of proof required is the clear and convincing standard and that the debtor's proof at the hearing did not rise to the level required. As a result, the Committee asserts that the debtor did not prove that its Second Plan of Reorganization is fair and equitable as required by § 1129(b). The Committee asserts that the record is devoid of evidence of the appropriate market rate of interest and the risk factors associated with the unsecured creditors receipt of value equal to the allowed amount of each claim in that class.

■ The Committee relies primarily on *In re Birdneck Apt. Assoc., II, L.P.*, 156 B.R. 499, 507 (Bankr.E.D.Va.1993), in which the court stated that the clear and convincing standard applies in a cram down. However, the *Birdneck* case was primarily concerned with an objecting secured creditor and the means required to establish a market rate of interest for such creditor. The debtor disputes that the evidentiary standard is that of clear and convincing, but urges that its proof meets the lesser standard of a preponderance of the evidence. We agree with the analysis of the court in the case of *In re DeLuca*, 1996 WL 910908 (Bankr.E.D.Va. Apr.12, 1996) that not all confirmation issues require proof by clear and convincing evidence. We do not believe the higher standard applies to the issues before this Court, and agree that the debtor has met its burden of proof in this case.

The debtor cites the testimony of Mr. Stewart, the Executive Vice President of the debtor concerning the risk factors present relative to the unsecured creditors getting paid 100% of their allowed claims. Those factors include weather, crop prices, produce markets, the management practices of the debtor and the existence of sufficient capital to sustain operations. The risk factors are common to the farming "industry" and Mr. Stewart acknowledged their influence on the success of the debtor over the life of the plan.

The uniqueness of this case is that there is no market in existence for the Court to look to in determining whether the proposed treatment of the unsecured claims is fair and equitable. Without being able to identify an existing comparable market, the debtor relied on the risk analysis of Mr. Stewart and the bare evidence it put in the record of the prevailing rates for

---

1. FRCP 52(c) provides: "If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule."

Treasury Bills, corporate bonds and various government issues. This Court accepts the debtor's theory that the Court can determine the "market rate of interest" from the evidence in the record. When no market exists to assist the court in its analysis, then the establishment of a risk free rate of interest, together with the identification of the particular risk factors present in this case is sufficient for the court to come to a conclusion as to the plan's treatment of the unsecured creditors. The uniqueness of the debtor's business and the plan's proposed treatment of unsecured creditors makes this a very fact and case specific process.

Evidence of the fact that expert testimony would not assist the Court in making its determination of the rate of interest to be paid to the unsecured creditors is the Court's decision not to allow the testimony of Mr. Williams, who had no experience with evaluating what a hypothetical lender to a farming operation would charge. There simply is no market to look to for the benefit of this Court's determination.

There is no market for a class of unsecured creditors possessing claims against a distressed farming operation. The Committee's suggestion that each of the unsecured claims must be investigated to determine the market rate of interest to be applied to each such claim is not feasible and is not warranted. Its concern over the treatment of the creditor body it represents is appropriate, but it has failed to persuade the Court of the appropriate methodology for determining the adequacy of the plan's treatment of the unsecured creditors, which further highlights the uniqueness of this case.

Another objection with respect to this motion relates to whether the debtor's proposal to pay the unsecured creditors 10% on their claims is "fair and equitable" as required by 11 U.S.C. § 1129. That section requires in pertinent part:

> (B) With respect to a class of unsecured claims—
>
> > (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim.[2]

The Committee cites a list of cases which it contends stands for the proposition that an unsecured creditor in Chapter 11 must receive at least a market rate of interest, as that rate is defined by expert testimony with respect to the specific creditor whose claim the plan is attempting cram down. The debtor acknowledges that the unsecured creditors are entitled to a "market" rate of interest, but disagrees as to how that rate must be proven. The debtor maintains it is paying the "market" rate defined by generally accepted market rates for money, with adjustments for the risk involved, because there is no definable market for the risk placed on the unsecured creditors by the plan terms. We agree with that approach to this particular situation.

The Court has reviewed the cases from this jurisdiction cited by each party to determine what methodology a debtor must use to determine the appropriate market rate of interest in order to cram down the claims of objecting unsecured creditors in a Chapter 11 case. In *United Carolina Bank v. Hall*, 993 F.2d 1126 (4th Cir.1993), a Chapter 13 individual debtor was attempting to cram down the claim of a bank secured by the debtor's mobile home. The debtor was attempting to cram down the bank's claim at a rate of 10%, which essentially represented the prime rate of interest charged by local banks plus an additional 1.5% to compensate for

---

**2.** With respect to secured claims, the plan must "provide that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(I).

risk. The bank objected, claiming the appropriate rate should be determined by reference to the rates of interest charged by area mobile home sellers, which varied between 13.5% and 15%.

The Fourth Circuit Court of Appeals held that for purposes of determining the appropriate interest rate on Chapter 13 plan payments, the value of the collateral retained by the debtor under the plan cramdown provisions is to be treated as a new loan and its rate of return to the secured creditor is to be matched with that which the creditor would otherwise obtain in its lending market, rather than using a rule which realizes to the creditor only its cost of funds, with the rate of interest being capped at the contract rate. The policy behind such a holding is to place the secured creditor in the same economic position as if the debtor had surrendered the collateral to the secured creditor.[3] *Id.*, at 1129. The bank was therefore entitled to the rate of interest it would typically earn on similar loans, realizing that mobile home dealers initially incurred the expense of placing the loans, which may not have been true of banks. The final analysis resulted in an examination of the bank's lending practices rather than those of the mobile home dealers:

> While the evidence showed that mobile home dealers were collecting 13.5% interest for the financing of new mobile homes and 15.5% for used mobile homes, the Bank might be receiving less. If the Bank generally makes the loan directly to consumers, the interest rate it collects, adjusted for its expenses, may be used to determine the appropriate rate of interest under the "cram down" provision. But if the Bank generally purchases the finance contracts, the rate reflected by the discounted purchase price is used. In neither case, however, is the gross rate of interest paid by consumers for similar loans used without

accounting for the Bank's expenses. *Id.*, at 1130.

Unlike *Hall*, *In re DeLuca* involved a Chapter 11 case in which extensive evidence of the market rate of interest was presented, in the form of expert testimony, to determine if a proposed interest rate was "fair and equitable" with respect to the present value due a rejecting class of secured claims. Upon weighing the competing testimony of several experts, the Court determined the rate at which the deferred payments to the secured creditor would have a present value equal to the allowed value of its secured claim as required by 1129(b)(2)(A)(i). The Court held that the secured creditor, Sallie Mae, would be entitled to a 9% rate of interest, as that was the hypothetical "blended" market rate of interest on a 100% loan-to-value ratio loan for a similar type property. A hypothetical rate had to be created because there was no "actual market" for 100% loan-to-value ratio loans, which are atypical loans. In *DeLuca*, as in *In re Birdneck*, *infra*, the interest rate experts:

> focused on constructing a hypothetical market rate using a "Mortgage–Equity/Band of Investment Analysis," in which the amount to be repaid is broken into two "bands" or components: (1) a first priority "debt" component in an amount equivalent to the loan-to-value ratio for which there is an actual market for loans, and (2) a second priority "equity" component for the remaining amount of the claim. The market interest rate for the debt component is then "blended" with the prevailing rate of return required by investors for the equity component to arrive at a hypothetical market rate of interest on a 100% loan-to-value ratio loan.

In the end, the *DeLuca* court examined the testimony of the experts with an eye towards the types of interest rates that would be charged by a lender for the type

---

**3.** "Accordingly, interest must be included at a rate that compensates the creditor for the delay in receiving the value it would have received more promptly if the debtor had surrendered the collateral under § 1325(a)(5)(C)." *Hall*, at 1129.

of loan involved in the reorganization. The dichotomy present in *Hall*, between the bank and the mobile home dealers, was less of a factor in *DeLuca*, in which the Court was dealing with a type of loan that essentially did not exist outside the parameters of the case.

In another Chapter 11 case decided in the Fourth Circuit before *Hall*, the Court held that a plan which provided the secured first mortgagee with a ten year balloon loan at an interest rate varying between 9.25 and 10.5 percent over ten years in an amount equal to the present value of its secured claim was confirmable over objection. The evidence showed that the rates were market interest rates and the debtor-introduced evidence of the present value of the debt would thus be paid to the secured creditor. *In re Bryson Properties XVIII*, 961 F.2d 496 (4th Cir.1992). In rejecting the creditor's assertion that the plan should pay the contract rate of interest (11.875%–12.875%), the court held that the rates were supported by debtor's expert testimony concerning the range of market interest rates for similar loans in the industry:

> Rifkin [debtor's expert] testified that a loan on property like Mid–America Plaza would have a term of three to five or seven to ten years, and an interest rate that was fixed or adjusted at certain intervals. He testified that the market rate for ten-year loans made by insurance companies over the three years prior to June 1990 ranged from 9.25 to 11 percent; for the one-year period prior to June 1990, rates ranged between 8.5 percent and 10.25 percent. Rifkin further testified that the market rate of interest for the loan made by Travelers would be between 9.875 and 10.25 percent, and that participation rights might reduce this percentage by between one-

eighth and one-quarter of a percent. Finally, he testified that the rate on Treasury bills was 8.74 percent, and that rates for ten-year loans would be about one to two percent higher.

Therefore, the Court examined not only the lending practices of the creditor, but of other insurance companies as well as general interest rates in the nation. The debtor was found to have met its burden of proof with respect to Sallie Mae by showing that the present value of its claim was being protected by the proposed interest rate.

Finally, in *In re Birdneck Apartment Associates*, 156 B.R. 499 (Bankr.E.D.Va. 1993), the Court held that the interest rate used to calculate the present value of a secured creditor under Chapter 11 cram down provisions is the market interest rate for loans of like terms, with due consideration for the quality of the collateral and the risk of subsequent default. The Court rejected the proposed interest rate in light of expert testimony that the rate was less than the hypothetical market rate of interest.

In *Birdneck*, since there was no "actual market"[4] the undersecured creditor of an apartment complex was entitled to a blended "hypothetical" rate determined with reference to a hypothetical refinancing scenario in order to determine an appropriate rate of interest, as was the case in *DeLuca*:

> To construct a hypothetical market rate of interest the witness broke the proposed loan into two components using the "Mortgage–Equity/Band of Investment Analysis:" (1) a 70 percent first priority debt component, and (2) a 30 percent second priority equity component. This was done to provide a market comparison because lenders typically

---

**4.** "Potomac's expert testified there is currently no actual market for a loan on these terms. However, this does not end the inquiry. If there were an actual market the debtor could access to obtain such a loan, § 1129(b)(2) would not be needed. To deny confirmation because there is no actual market for a similar loan would n effect be giving the market permission to repeal § 1129(b)(2) ... Therefore the court's inquiry must focus on a hypothetical market rate of interest for a loan of similar terms." *Birdneck Assoc.*, at 508.

do not make loans of 100 percent loan-to-value ... the effective interest rate on the 70 percent debt component would be approximately 8.66 percent, and the interest rate on the 30 percent equity component would be approximately 14 percent. By blending these rates Potomac's witness concluded that a hypothetical market rate of interest on the debtor's proposal would be approximately 10.74 percent.

The Court concluded that the rate of interest proposed by the debtor, 8.25% was inadequate in light of the evidence of the "blended" market rate of interest.

■ While both parties agree that an unsecured creditor is entitled to a market rate of interest on its claim, the disparity revolves around the methodology to be adopted by the Court in determining the appropriate market rate of interest. The Committee urges the Court to adopt a "creditor specific" approach as defined by the testimony of expert witnesses and as used by the Fourth Circuit in *Hall*. The debtor did not offer expert testimony on the issue of rates charged by similarly situated creditors and urges this Court to find value by the "means most appropriate for the circumstance" building a market formula based on the market rate for money, as evidenced by current interest rates published by Bloomberg or *The Wall Street Journal*, adjusted for the risk experienced by the unsecured creditors. The debtor claims this methodology is appropriate unless the plan's objectors come forward with more probative evidence based on real markets. The debtor urges that requiring a creditor specific analysis by experts of each of the unsecured creditor's claims to be crammed down would be unduly burdensome and really meaningless. The Committee also maintains that there is inadequate evidence in the record to determine an appropriate rate of interest.

The line of cases previously reviewed by the Court deal with a single secured creditor in each, rather than with a group of unsecured creditors. The approach utilized by *Hall* and its progeny appears to be based on Collier's "coerced loan" theory. C. Frank Carbiener, *Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L.Rev 42 (1986). The treatise states that:

> deferred payment of an obligation under a plan is like a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral and risk. Collier on Bankruptcy ¶ 1129.06 (Mathew Bender 1998).

While this approach is ideal when dealing with one or two secured creditors, it is catastrophic when dealing with a large number of unsecured creditors in a complex Chapter 11 case. There are a total of 103 claims filed in this case, with the vast majority of those claims being unsecured. It is not feasible for the debtor or this Court to separately investigate each unsecured creditor to determine the prevailing market rate for a loan similar to the one proposed in the plan, and then determine separate interest rates for each unsecured creditor. It is only practical to select a single interest rate applicable to all of the unsecured creditors dealt with in the plan of reorganization.

We can simply find no authority requiring a court to examine each unsecured creditor to determine what its specific market rate of interest should be. The appropriate approach is to use a baseline, market rate of interest plus an appropriate add-on for the risk factors involved. This approach is most appropriate where no real market exists. *In re Villa Diablo Assocs.*, 156 B.R. 650, 653 (Bankr.N.D.Cal. 1993). In this case, it is the only feasible means to arrive at a fair and adequate rate. The Committee's position ignores the fundamental difference between secured and unsecured claims and the fact that there is no established market for the

Court to look to in evaluating the proposed interest rate. The stated policy behind § 1129 is to provide the creditor with the same value it would receive if the debtor were to have surrendered the collateral at the beginning of the bankruptcy.[5] Since there is no collateral involved in claims of unsecured creditors, those creditors should not be unfairly discriminated against, yet they cannot be treated in the same way as secured creditors.

This difference can clearly be seen in the language of the Code. The cases relied on by the Committee interpret 11 U.S.C. § 1129(b)(2)(A)(i)(II), and those cases all deal with secured claims. While the language in this section is similar to § 1129(b)(2)(B)(i) dealing with unsecured claims, it is not identical. The provision pertaining to secured claims defines value as "the holder's interest in the estate's interest in such property" while the provision pertaining to unsecured claims defines value as "the allowed amount of such claim." Clearly, the existence of security for a claim must result in different and unequal treatment for unsecured and secured claims. Therefore, the Committee's contention that the two types of claims must be treated identically when determining present value is unconvincing.

 The debtor suggests that the base rate used by the Court should be determined by reference to the prevailing rate for Treasury notes (5.875%), the Inflation Indexed Treasury (3.625%) and the Farm Credit Financial Assistance Corp. Issue (8.80%). This is an appropriate means of calculating a base rate in the circumstances presented by this case. An average of these rates is 6.1%. In light of that, we hold that the proposed rate of 10% represents a fair rate in that it provides for additional risk (at a rate of 3.9%, which represents a much higher rate than the 1.5% provided in *Hall*), and provides

the unsecured creditors with the present value of their claim. This analysis is specific to the facts in this case, where no definable market exists for the unsecured creditors.

We find that the proper method of determining the "market" rate of interest in this case is to utilize an established, risk free interest rate and to adjust that rate upward as we have done to reflect the particular risk experienced by the unsecured creditors of the debtor. We find that the plan proposed interest rate of 10% for the unsecured creditors is a "market" rate of interest in this case.

## CONCLUSION

The Court having determined that the debtor has met its burden of proof under 11 U.S.C. § 1129(b)(2)(B), the Official Unsecured Creditor's Committee's Motion for Judgment on Partial Findings is DENIED.

IT IS SO ORDERED.

---

5. The fair and equitable standard requires that a secured claimholder: (1) retain its lien; and (2) receive deferred cash payments totaling at least the allowed amount of the claim-

ant's secured claim *and a present value equal to the value of the collateral.* *Birdneck Assoc.,* at 507. [Emphasis added]