**In re Ralph PALMER, Sr., Debtor.**

**Bankruptcy No. 98–40303.**

United States Bankruptcy Court, S.D. Illinois.

Sept. 14, 1998.

James Van Winkle, McLeansboro, IL, for Banterra Bank.

Marcus H. Herbert, Carbondale, IL, for debtor.

## OPINION

KENNETH J. MEYERS, Bankruptcy Judge.

At issue in this case is the appropriate rate of interest to be paid on secured claims in a Chapter 13 proceeding under the so-called "cram down" provision of 11 U.S.C. § 1225(a)(5)(B)(ii). Banterra Bank Group ("Bank") objects to confirmation of the debtor's plan, asserting that the interest rate of 8% to be paid on its secured claims under the debtor's plan is insufficient to meet the "present value" requirement of § 1225(a)(5)(B)(ii). The Bank maintains that, in order to pay the value of the Bank's claims over time, the plan must pay interest at the original contract rates of the debtor's notes, which vary from 11% to 13%.[1]

1. Two of the notes in question are part of an SBA loan program with a contract rate of prime plus 3.25%, which would be 11.75%. The other two notes are separate obligations, with contract rates of 13% and 11%, respectively.

2. The Supreme Court, looking to the definition of "secured claim" in § 506(a), concluded that "the value of property retained because the debtor has

At hearing, the Bank argued further that, in light of the Supreme Court's recent decision adopting a "replacement value" standard for valuing property retained by Chapter 13 debtors under § 1225(a)(5)(B)(ii),[2] see Associates Commercial Corp. v. Rash, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), the debtor is required to pay a "market rate" of interest, which is the rate he would have to pay for other lender-arranged financing. The Bank stated it would provide testimony that the current "market rate" for loans comparable to those at issue would be prime plus 3%, or 11½%.

The debtor, in turn, asserts that it is "customary" in this Court to allow an interest rate of 9% on undersecured loans.[3] While not directly addressing the Bank's argument based on Rash, the debtor contends that this rate of interest would constitute a "reasonable repayment" of the Bank's claims.

Section 1225(a)(5)(B)(ii) provides, as one of the requirements for confirmation of a Chapter 13 plan, that

(5) with respect to each allowed secured claim provided for by the plan—

. . . . .

(B)(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim[.]

11 U.S.C. § 1225(a)(5)(B)(ii). Section 1225(a)(5)(B)(ii) allows a debtor to keep property over the objection of a secured creditor so long as the debtor's plan provides for the creditor to receive the present value of its collateral in distributions under the plan. Because payment is made over a period of time rather than immediately, the plan must include interest at a rate that will give the creditor "present value."

exercised the § 1225(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed ... use.'" 117 S.Ct. at 1886.

3. The debtor offered no explanation of the inconsistency between this supposed "customary" rate and the 8% rate proposed in his plan for payment of the Bank's claim.

Section 1325(a)(5)(B)(ii) provides little guidance regarding the appropriate interest rate for giving a secured creditor the value of its allowed secured claim. Because the goal of this section is to place the creditor in the same position it would have been had the collateral been repossessed and sold at the time of filing, courts generally conclude that a "market rate" should be applied. However, the courts have developed different approaches for determining this "market rate."

Courts adhering to the so-called "coerced loan" approach take the view that a Chapter 13 cram down is, in essence, forcing the secured creditor to extend a new loan to the debtor. These courts define "market rate" as what the secured creditor would charge other borrowers for loans of similar character, duration, and amount; thus, evidence concerning interest rates for similar loans in the region is determinative. In order to reduce litigation costs, some courts adopting this approach have imposed a rebuttable presumption that the contract rate is equivalent to "market rate." Therefore, in the absence of evidence that the creditor's costs have changed since inception of the loan contract, these courts approve plans setting the contract rate as the appropriate rate under § 1325(a)(5)(B)(ii). *See, e.g., General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 70–71 (3d Cir.1993); *Green Tree Financial Servicing Corp. v. Smithwick,* 121 F.3d 211, 214 (5th Cir.1997); *see also In re Segura,* 218 B.R. 166, 175–76 (Bankr.N.D.Okla.1998); *In re Oglesby,* 221 B.R. 515, 523 (Bankr.D.Colo.1998).

Another approach, known as the "formula" approach, ties the interest rate to a "risk-free" rate, such as that on a U.S. treasury instrument of comparable duration, and adds a "risk premium" to adjust for the risk inherent in a bankruptcy reorganization. *See In re Milham,* 141 F.3d 420, 424 (2d Cir.1998), restating holding of *In re Valenti,* 105 F.3d 55, 64 (2d Cir.1997), abrogated in part by *Assoc. Commercial Corp. v. Rash,* 117 S.Ct.

at 1886 n. 5. Since information on treasury rates is readily available, this approach has the advantage of being easily and objectively applied; however, determination of the risk premium remains fact-sensitive and, thus, results in either time-consuming litigation or adoption of a somewhat arbitrary rate by the court. *See generally* Matthew Y. Harris, Comment, *Chapter 13 Cram Down Interest: Another Day, Another Dollar—A Cry For Help In Ending the Quest For the Appropriate Rate,* 67 Miss.L.J. 567 (Winter 1997).

Finally, courts applying a third approach, known as the "cost of funds" approach, look to the rate at which the creditor borrows capital, reasoning that if the creditor receives the interest rate necessary to borrow the same amount, it could use the borrowed funds to make new loans at the current market rate. This approach, although employed by various bankruptcy courts, has not been adopted by any of the circuit courts in a Chapter 13 context. *Id.; see also* David G. Epstein, *Don't Go And Do Something Rash About Cram Down Interest Rates,* 49 Ala. L.Rev. 435, 443–44 (Winter 1998).

In this case, the Court has not previously considered the issue of an appropriate interest rate to be paid secured creditors in Chapter 13 cases nor, contrary to the debtor's assertion, is it aware of any "customary" rate in this district. However, in an earlier Chapter 12 case, *In re Bergbower,* 81 B.R. 15, 16–17 (Bankr.S.D.Ill.1987), the Court utilized the "formula" approach to determine an appropriate interest rate under the comparable "present value" provision of 11 U.S.C. § 1225(a)(5)(B)(ii).[4] Reasoning that a secured creditor in a Chapter 12 case should be compensated for risks normally factored into a conventional lender's interest rates, such as collection costs, administrative costs, profit margin, and collateral depreciation, the Court held that an appropriate rate would be the rate on a treasury bond with a maturity matching the term of repayment under the debtor's plan, with a 2% upward adjustment

---

4. Section 1225(a)(5)(B)(ii) provides, as a requirement for confirmation of a Chapter 12 plan, that:
(5) with respect to each allowed secured claim provided for by the plan—
(B)(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim[.]
11 U.S.C. § 1225(a)(5)(B)(ii).

"[to reflect] the overall risk associated with a Chapter 12 reorganization." *See Bergbower*, at 16.

Because the confirmation requirements in Chapters 12 and 13 cases are virtually identical, courts have uniformly considered rulings under one chapter's provisions to be applicable in the other. *See* Epstein, *supra* at 441–42; *see also Segura*, 218 B.R. at 171 n. 3. Thus, without more, the Court's *Bergbower* decision would be applicable in this Chapter 13 case. However, subsequent to *Bergbower*, the Seventh Circuit Court of Appeals examined the issue of cram down interest rates in *Koopmans v. Farm Credit Services of Mid-America, ACA*, 102 F.3d 874 (7th Cir.1996). To the extent, therefore, that this Court's *Bergbower* ruling conflicts with *Koopmans*, the Seventh Circuit's decision controls in determining an appropriate rate in this case.[5]

Unfortunately, *Koopmans* is somewhat opaque concerning the method to be employed in determining a cram down rate under § 1225(a)(5)(B)(ii). Stating that the creditor must get "the market rate of interest" for loans of equivalent duration and risk, the *Koopmans* court noted that the bankruptcy court approximated this by starting with the prime rate of interest for similar loans at the time and adding a risk premium of 1.5 percent because of the debtors' sorry repayment record. *See Koopmans*, 102 F.3d at 874–75. In affirming, the district court expressed approval for the bankruptcy court's "coerced loan" approach to determining rates. *Id.* at 875. The Seventh Circuit, in turn, affirmed the district court's ruling, with the caveat that it was not "implying that 'prime-plus' is the only way to approximate the market rate of interest—for participants in the market may use other methods[.]" *Id.* The *Koopmans* court concluded with the spe-

cific holding that "the creditor is entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk." *Id.*

With this apparent endorsement of the "coerced loan" method of determining cram down rates, the *Koopmans* court went on to discuss "a few of the potential alternatives." The court unequivocally rejected use of the parties' original contract rate as either a minimum or maximum rate, noting that a debtor who wants to change the duration of a loan must refinance at the current market rate.[6] In addition, the court sanctioned use of the rate the government pays for money, characterized as "the T-bill rate," as long as this rate is adjusted for risk. *Id.* The court stated, however, that "adjustments would make the final interest rate the same whether the bankruptcy court starts with the prime rate or the T-bill rate." *Id.* Reasoning, then, that "nomenclature is irrelevant," the court concluded that it is "best to stick with the market's approach to estimating the risk premium. *On this record, the market's approach is prime-plus.*" *Id.* (emphasis added).

■■■ This discussion in *Koopmans* leads the Court to believe that, rather than choosing one of the "potential alternatives" outlined, the Seventh Circuit collapsed these various approaches under the overarching concept of "current market rate." Thus, any of the various methods of calculating cram down rates is valid so long as credible evidence is introduced showing that the resulting rate constitutes the market rate of interest.[7] *See also* Epstein, *supra* at 454. As noted by the district court in *Koopmans*,

> it is not altogether clear whether the [bankruptcy] court used "formula" method for determining the applicable interest

---

5. The Court notes that, in this case, the parties failed to cite either *Bergbower* or *Koopmans* as authority for their respective positions.

6. The court explained that "this [current market rate] may be lower than the one provided by contract. Just as the debtor cannot insist on the lower of the contract or current market rates, neither may the creditor obtain the higher of contract or market rate. The market must be used consistently. [Citation omitted.]" *Koopmans*, 102 F.3d at 875.

7. The *Koopmans* court noted that even the "cost of funds" approach—limiting a creditor to its "cost of capital"—expresses the concept of "market rate of interest,"

> for that is what [the creditor's] cost of capital is: the price it must pay to its own lenders, plus the costs of making and administering loans, plus reserves for bad debts (that is, the anticipated rate of non-repayment).

102 F.3d at 876.

rate, the evidentiary method, or a combination of the two, *but the difference is immaterial where, as here, the rate selected by the court was consistent with the evidence submitted at trial regarding the prevailing market rate for similar loans in the region.*

196 B.R. 425, 428 (N.D.Ind.1996) (emphasis added). The Seventh Circuit's *Koopmans* decision accords a bankruptcy court considerable deference in determining cram down rates and requires only that the court conduct a factual inquiry into the rate the secured creditor would have earned in the relevant market area.

The "market rate" rationale of *Koopmans* is consistent with the Supreme Court's recent *Rash* decision in the sense that, rather than prescribing a particular method for determining rates, *Koopmans* allows a court to apply any method that fulfills the statutory requirement of providing a secured creditor the present value of its claim.[8] Because the courts' rulings in both *Koopmans* and *Rash* emphasize construction of the statutory language over considerations of efficient case administration, a bankruptcy court cannot justify its determination of cram down rates by ease of application or the uniformity a particular approach affords. *See* Epstein, *supra* at 462. Thus, the "formula" approach adopted by this Court in *Bergbower* is not appropriate for determining cram down rates in Chapters 12 and 13 cases unless evidence is presented showing that this formula reflects the prevailing market rate for similar loans.[9]

■ In this case, the parties presented argument for the particular rates they sought to have applied, but no evidence was introduced to show that these rates actually reflect current market rates. Accordingly, the Clerk is directed to schedule the Bank's objection to confirmation of the debtor's plan for an evidentiary hearing on the issue of the

interest rates to be paid on the Bank's claims.

**SEE WRITTEN ORDER.**

---

**8.** As the *Rash* court stated in footnote 6:
[o]ur recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases *leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of evidence presented* .

*Rash,* 117 S.Ct. at 1886 n. 6 (emphasis added).

**9.** This is not to say, however, that the Court must conduct an evidentiary hearing in every case. Parties are always free, to avoid excessive litigation costs, to stipulate concerning the market rate of interest.