**In re Theresa A. BIVENS, Debtor.**

**Bankruptcy No. 04 B 20324.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 13, 2004.

Amended Jan. 3, 2005.

Brian C. Pedersen, for Debtor.

David Cybak, for Creditor.

### *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

These matters come before the Court on the objection of Nuvell Credit Corporation ("Nuvell") to confirmation of the Chapter 13 plan of debtor Theresa A. Bivens ("Bivens") with respect to a used 2000 Chevrolet Venture Extended Van (the "Vehicle"), which Bivens purchased by obtaining financing from Nuvell, as well as on Nuvell's motion to modify the automatic stay.[1] Af-

---

1. The motion is actually entitled "Objection to Confirmation and Motion to Modify the Auto-

matic Stay and Motion for Pre-confirmation Adequate Protection Payments of Nuvell

ter conducting an evidentiary hearing, examining the admitted exhibits, and reviewing the testimony, the Court finds that the 7% rate of interest specified in Bivens' plan will provide Nuvell with equivalent present value of its allowed secured claim as paid over time. Accordingly, the Court overrules Nuvell's objection to confirmation. Bivens' oral motion made at trial to extend her plan term to sixty months is granted. Nuvell's motion to modify the stay is granted without leave of the Court upon Bivens' future default in two or more monthly plan payments or upon cancellation or lapse of the insurance on the Vehicle covering Nuvell's interest, after fourteen days' notice of the default by Nuvell to Bivens and her attorneys and her failure to cure such default within such period.

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G), and (L).

## II. *APPLICABLE STANDARDS*

A. 11 U.S.C. § 1325(a)(5)(B)(ii): The Cram Down Provision

Section 1325 of the Bankruptcy Code contains the requirements for confirmation of a Chapter 13 plan. With respect to secured claims, § 1325(a)(5) provides as follows:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B) (i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder[.]

11 U.S.C. § 1325(a)(5). Under this provision, if a secured creditor will not accept a proposed Chapter 13 plan, the debtor must do one of two things in order to get the plan confirmed: (1) surrender to the creditor the property securing that creditor's claim, or (2) keep the collateral and provide the creditor with a lien securing the claim, as well as a promise of future payments whose total "value, as of the effective date of the plan . . . is not less than the allowed amount of such claim." *Id.* See also *Till v. SCS Credit Corp.*, 541 U.S. 465, ——, 124 S.Ct. 1951, 1955, 158 L.Ed.2d 787 (2004); *In re Scott*, 248 B.R. 786, 788 (Bankr.N.D.Ill.2000). The latter option is commonly referred to as the "cram down" alternative, because it allows the debtor to "cram down" the proposed plan over the objection of a secured claim holder. *Till*, 541 U.S. at ——, 124 S.Ct. at

Credit Corporation." On June 30, 2004, the Court entered an order granting preconfirmation adequate protection disbursements to Nuvell of $250.00 per month, beginning June 2004 and continuing until plan confirmation.

Accordingly, the instant Memorandum Opinion addresses only Nuvell's objection to confirmation and its motion to modify the automatic stay.

1955; *Household Auto. Fin. Corp. v. Burden (In re Kidd),* 315 F.3d 671, 672, 675 (6th Cir.2003) (noting that "[a]lthough the Bankruptcy Code nowhere uses the words 'cram down,' the term has come to denote the confirmation of a plan over the objection of a secured creditor"); *In re Jones,* 219 B.R. 506, 507 (Bankr.N.D.Ill.1998).

Through a cram down, a debtor is allowed to keep her property, and the secured creditor retains its lien. *Jones,* 219 B.R. at 507. However, if the allowed secured claim is not paid in full on the effective date of the Chapter 13 plan, the debtor must provide the creditor with a stream of installment payments that total the "present value" of the claim. *Id.* Indeed, the very purpose of Chapter 13's cram down provision is to ensure that the creditor is "in the same economic position that it would have been in had it received the value of its allowed claim immediately." *Gen. Motors Acceptance Corp. v. Valenti (In re Valenti),* 105 F.3d 55, 63 (2d Cir.1997), *overruled on other grounds by Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

In practice, in order to pay a nonconsenting secured creditor the "indubitable equivalence" of its property interest in compliance with § 1325(a)(5)(B)(ii), *Koopmans v. Farm Credit Servs. of Mid.-Am., ACA,* 102 F.3d 874, 875 (7th Cir. 1996), the debtor's plan must provide for payments of not only the principal amount of the allowed claim, but also adequate interest to yield present value as of the effective date of the plan, *Scott,* 248 B.R. at 789. Nuvell objects to confirmation of Bivens' plan, asserting that the proposed interest rate of 7% to be paid on its secured claim is insufficient to meet the present value requirement of § 1325 and that the underlying contract rate of 18.95% in the relevant loan documents between the parties should be required. Thus, at issue is the proper approach to take in determining the cram down interest rate required to provide the present value of Nuvell's claim. As "the more knowledgeable party," Nuvell bears the burden of establishing the appropriate rate to apply in this matter. *Till,* 541 U.S. at ——, 124 S.Ct. at 1964.

## B. 11 U.S.C. § 362(d): Modification of the Automatic Stay

Section 362(d) of the Code provides for modification of the automatic stay and states in pertinent part as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d). Thus, § 362(d) provides two grounds under which relief from the automatic stay may be granted. *In re Jackson,* No. 98 B 15483, 1999 WL 703093, at *3 (Bankr.N.D.Ill. Sept.9, 1999) (citing *In re 8th St. Vill. Ltd. P'ship,* 88 B.R. 853, 855 (Bankr.N.D.Ill.), *aff'd,* 94 B.R. 993 (N.D.Ill.1988)). The first ground is cause, including lack of adequate protection. 11 U.S.C. § 362(d)(1). The second is that the debtor does not have any equity in the property and the property is unnecessary

to an efficacious reorganization. 11 U.S.C. § 362(d)(2).

■■■ As the party requesting relief from the stay, Nuvell bears the burden on the issue of Bivens' equity in the Vehicle. 11 U.S.C. § 362(g)(1). *See also Fed. Nat'l Mortgage Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship,* 153 B.R. 204, 208 (N.D.Ill.1993); *In re Standfield,* 152 B.R. 528, 534 (Bankr.N.D.Ill.1993). Bivens, opposing such relief, has the burden of proof on all other issues. 11 U.S.C. § 362(g)(2). *See also Fed. Nat'l Mortgage,* 153 B.R. at 208; *Standfield,* 152 B.R. at 534. The decision to lift or otherwise modify the automatic stay pursuant to § 362(d) is committed to the sound discretion of the bankruptcy court. *Jackson,* 1999 WL 703093, at *3 *(citing In re Boomgarden,* 780 F.2d 657, 660 (7th Cir.1985); *Holtkamp v. Littlefield (In re Holtkamp),* 669 F.2d 505, 507 (7th Cir.1982)).

## III. FACTS AND BACKGROUND

The facts in this matter are substantially undisputed. On August 4, 2003, Bivens bought the Vehicle from Webb Chevrolet, Inc. for $12,202.34, plus $1,024.90 in taxes and fees. Ex. 1, Retail Installment Contract; Ex. 2 at ¶¶ 1, 3.[2] At the same time, she purchased a service contract covering the Vehicle for $1,495.00. Ex. 1, Retail Installment Contract. Bivens made a cash down payment of $500.00 and received a $200.00 trade-in credit for her 1992 Dodge Caravan. *Id.* She financed the balance of $14,022.24 by entering into a retail installment contract (the "Contract"), which

Webb Chevrolet thereafter assigned to Nuvell. *Id.;* Ex. 2 at ¶ 22.

Pursuant to the Contract, the balance, plus interest at the rate of 18.95%, was to be paid by Bivens in sixty monthly installments of $366.22.[3] Ex. 1, Retail Installment Contract; Ex. 2 at ¶¶ 23, 24. Webb Chevrolet—and Nuvell, as assignee—retained purchase money security interests in the Vehicle and in the unearned premiums of the extended service contract, both of which were subsequently perfected by Nuvell. Ex. 1, Retail Installment Contract; Ex. 2 at ¶¶ 16, 19, 20.

From September 2003 through March 2004, Bivens made six payments under the Contract, four of which were late. Ex. 2 at ¶¶ 26–28, 30–32, 34–37. On May 25, 2004, Bivens, by then in default, filed a voluntary petition for relief under Chapter 13 of the Code. Motion at ¶ 1. At the same time, she filed a Chapter 13 plan, which valued Nuvell's secured claim at $7,500.00 and proposed to pay the claim at an annual percentage rate of 7%. Ex. 7 at p. 2; Motion at ¶ 11. Under these terms, the total amount to be paid on the claim, including interest, over the initial plan term of thirty-nine months was estimated at $8,398.06. Ex. 7 at p. 2.

On June 1, 2004, Nuvell filed its proof of claim in the amount of $13,928.52, asserting that the entire amount was secured.[4] Ex. 6. One week later, on June 8, 2004, Nuvell filed the instant objection to confirmation and motion to modify the automatic stay. Nuvell disputed Bivens' appraisal of its secured claim at $7,500.00, as well as the interest rate of 7% under the proposed

---

**2.** All numbered exhibits referred to in this Opinion are those submitted by Nuvell, unless otherwise stated.

**3.** Under the terms of the Contract, Bivens was to pay a total of $21,973.20. Ex. 1, Retail Installment Contract. That amount included $7,950.96 in interest. *Id.*

**4.** According to an "Itemized Statement" included at the end of the proof of claim, the secured claim amount includes the principal balance of $13,482.74, as well as a pre-petition "finance charge" of $445.78. Ex. 6 at p. 2.

plan. Subsequently, the parties stipulated that the value of the Vehicle for purposes of confirmation is $10,000.00. Ex. 5 at ¶ 1. Bivens' amended plan (the "Amended Plan"), filed on October 25, 2004, reflects the revised principal figure of $10,000.00 [5]; however, the annual percentage rate proposed under the Amended Plan remains at 7%. The parties do not dispute that some amount of interest is due. Rather, the disagreement focuses on which interest rate should be applied. Nuvell rigorously argues that the Amended Plan must pay interest at the original Contract rate of 18.95% in order to cover the value of the claim over time rather than the 7% rate proposed by Bivens.

Given the parties' disagreement, on October 27, 2004, the Court conducted an evidentiary hearing which centered on the appropriate interest rate that should be applied to the installment payments for Bivens' Vehicle. The matter was taken under advisement.

## IV. DISCUSSION

■ Before a Chapter 13 plan invoking the cram down provision can be confirmed, a court must make two determinations: (1) the "replacement value" of the collateral as of the effective date of the plan, *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 960–63, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), and (2) the interest rate that will provide the creditor with "value ... not less than the allowed amount of [its] claim" over the course of the plan, 11 U.S.C. § 1325(a)(5)(B)(ii). Before turning to the latter determination—the rate of interest that should be applied to Nuvell's secured claim as required under the cram down provision—the Court first addresses the value of the collateral in this matter.

■ The United States Supreme Court has held that "the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same proposed ... use." *Rash*, 520 U.S. at 965, 117 S.Ct. 1879 (internal quotation omitted). That is, in the context of cram down, § 506(a) requires the use of "replacement value" rather than "foreclosure value." [6] *Id.* As the trier of fact, the bankruptcy court is charged with establishing the best way to determine replacement value based upon the evidence presented. *Id.* at 965 n. 6, 117 S.Ct. 1879.

As discussed above, the parties agree that the Vehicle securing Nuvell's claim is worth $10,000.00. Ex. 5 at ¶ 1. Further, according to the Amended Plan, Bivens has decided to retain the extended service contract covering the Vehicle and pay Nuvell a secured claim of $872.08, the cancellation value of the unearned premiums as

---

**5.** The amount of the secured claim reflected in Bivens' Amended Plan is $10,872.08: $10,000.00 for the Vehicle and $872.08 for the unearned premiums of the service contract as of the filing date. Amended Plan; Ex. 2 at ¶ 21.

**6.** Section 506(a) provides in relevant part as follows:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a). Like many claims in bankruptcy cases where the collateral is a used motor vehicle, Nuvell's claim here is bifurcated into its secured and unsecured components pursuant to § 506(a).

of the original filing date. Amended Plan; Ex. 2 at ¶ 21. Thus, the value of Nuvell's secured claim is limited to $10,872.08; the remaining unsecured balance of $3,056.44 is to be paid along with the other unsecured claims. *See* 11 U.S.C. § 506(a). What remains to be determined is the interest rate to be charged on Nuvell's secured claim component in terms of present value analysis.

## A. Determining the Cram Down Interest Rate

At the heart of the interest rate issue is the concept of "present value," or the "time value of money." *In re Fisher*, 29 B.R. 542, 543 (Bankr.D.Kan.1983). Specifically, a dollar received today is worth more than a dollar to be received in the future because money in hand can be immediately reinvested, thereby earning more money. *Id.; Kidd*, 315 F.3d at 677. Thus, if a debtor's payments are spread out over time, her creditors will receive less than they are entitled to. *Kidd*, 315 F.3d at 677. Accordingly, present value theory requires the debtor to pay the creditor some amount of interest in order to compensate the creditor for the delay in payment. *Fisher*, 29 B.R. at 543. "The application of this theory, utilizing a stream of future payments discounted over time, to determine the value of this income stream at any given point in time is known as present value analysis." *In re Collins*, 167 B.R. 842, 844 (Bankr.E.D.Tex.1994), *abrogated on other grounds by In re Smithwick*, 121 F.3d 211 (5th Cir.1997).

The Code is silent as to the rate of interest, or the discount rate, that will result in the payment of the present value of a creditor's allowed secured claim. *Till*, 541 U.S. at ——, 124 S.Ct. at 1958 (noting that the "Code provides little guidance as to which of the rates of interest ... Congress had in mind when it adopted the cram down provision"); *In re Palmer*, 224 B.R. 681, 683 (Bankr.S.D.Ill.1998) (same). Thus, it is not surprising that the appropriate approach for determining such a rate has been the subject of myriad opinions and " 'arguably the most debated economic issue in bankruptcy litigation.' " *Scott*, 248 B.R. at 789 (*quoting* Monica Hartman, *Selecting the Correct Cramdown Interest Rate in Chapter 11 and Chapter 13 Bankruptcies*, 47 UCLA L.Rev. 521, 522 (1999)). Courts have generally agreed that a "market rate" of interest should apply in calculating present value, because the interest rate "must be responsive to current economic conditions." *In re DeMaggio*, 175 B.R. 144, 150 (Bankr.D.N.H. 1994); *see also In re Till*, 301 F.3d 583, 589 (7th Cir.2002), *rev'd on other grounds*, *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004); *Smithwick*, 121 F.3d at 214; *Koopmans*, 102 F.3d at 874–75; *Valenti*, 105 F.3d at 63; *Gen. Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 66–67 (3d Cir.1993); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1129–30 (4th Cir.1993); *Farm Credit Bank of Spokane v. Fowler (In re Fowler)*, 903 F.2d 694, 697 (9th Cir.1990); *Hardzog v. Fed. Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858, 859–60 (10th Cir.1990); *United States v. Arnold*, 878 F.2d 925, 929–30 (6th Cir.1989); *Scott*, 248 B.R. at 790; *Palmer*, 224 B.R. at 684. However, prior to the U.S. Supreme Court's decision in *Till v. SCS Credit Corp.*, courts used various methods in determining this market rate and in performing the calculations necessary to ensure that secured creditors received payments whose total present value equaled that of the creditors' allowed secured claims.

Under the coerced or forced loan method, a Chapter 13 cram down essentially forces the secured creditor to extend a new loan to the debtor. *Onyx Acceptance Corp. v. Hartzol*, No. 02 C 0733, 2002 WL

908714, at *2 (N.D.Ill. May 6, 2002); *Palmer*, 224 B.R. at 683. Accordingly, courts adhering to this approach have set the interest rate at a level that the creditor could have obtained had it foreclosed on the loan, sold the collateral, and reinvested the proceeds in loans of similar character, duration, and amount to similarly situated debtors. *Valenti*, 105 F.3d at 63; *Ameri-Credit Fin. Servs., Inc. v. Swafford (In re Swafford)*, 296 B.R. 66, 68–69 (Bankr. N.D.Ga.2002) (finding that courts utilizing the coerced loan theory determine the interest rate "in reference to what another lender in the market would charge if it made a similar loan").

In contrast, the cost of funds method is based on the rate at which the creditor itself borrows money. *Till*, 301 F.3d at 589; *Onyx Acceptance Corp.*, 2002 WL 908714, at *2; *Scott*, 248 B.R. at 790; *Palmer*, 224 B.R. at 683. "Courts using this approach reason that the best way to place a creditor in the same economic position that it would have been in had the debtor surrendered the collateral immediately is to assume that the creditor would borrow the money representing the value of its allowed claim." *Valenti*, 105 F.3d at 63. The creditor could then extend new loans to customers at "prevailing rates in the commercial market." *Id.*

Bivens urges the Court to adopt the formula approach in the matter at bar. Adopted by the plurality in *Till*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), the formula or "risk plus" method begins with a standard measure of risk-free lending, such as U.S. treasury bills or the national prime rate. *Id.* at 1957; *Koopmans*, 102 F.3d at 875; *Scott*, 248 B.R. at 793; Waltraud S. Scott, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter of Interest*, 63 Wash. L.Rev. 1041, 1048 n. 41 (1988). Because debtors generally present a greater risk of default than solvent commercial borrowers, *Till*, 541 U.S. at ——, 124 S.Ct. at 1961, a risk factor interest premium is added to the standard measure, based on the relevant considerations of the case, *Onyx Acceptance Corp.*, 2002 WL 908714, at *2; *Scott*, 248 B.R. at 791–92; *Palmer*, 224 B.R. at 683.

Nuvell effectively rejects the formula approach, pressing the Court to espouse the presumptive contract rate method, which was approved by the Seventh Circuit majority in *Till*, 301 F.3d 583 (7th Cir.2002). In that case, the court held that the contract rate reflected in the underlying agreement between the parties should apply in the absence of more persuasive evidence to the contrary. *Id.* at 592–93. However, that rate is merely a presumption, which either the debtor or the creditor can "challenge with evidence that a higher or lower rate should apply." *Till*, 541 U.S. at —— - ——, 124 S.Ct. at 1957–58; *see also Jones*, 999 F.2d at 70–71.

### 1. The U.S. Supreme Court's Decision in *Till*

The Supreme Court ended the dispute among the circuit courts as to which approach provides equivalent present value of an allowed secured claim as paid over time when it decided *Till v. SCS Credit Corp.* Addressing each approach in turn, a plurality of the Court rejected the coerced loan, presumptive contract rate, and cost of funds methods. *Till*, 541 U.S. at ——, 124 S.Ct. at 1960. According to the plurality, "[e]ach of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure [that] the debtor's payments have the required present value." *Id.* In contrast, the plurality noted, the formula or "risk plus" method "entails a straightforward, familiar, and objective inquiry, and minimizes the need

for potentially costly additional evidentiary proceedings." *Id.* at 1961. Further, "the resulting 'prime-plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Id.* For all of these reasons, the plurality found that the formula method "best comports with the purposes of the Bankruptcy Code." *Id.* at 1961–62. Accordingly, the Court held that the proper approach that bankruptcy courts must take in determining the adequate rate of interest on cram down loans in Chapter 13 proceedings is the formula or "risk plus" approach. *Id.*

▮▮▮▮▮ Using this method, the bankruptcy court must start with a risk-free standard measure. *Id.* at 1961. Then, in determining the proper size of risk adjustment, the court should consider the nature of the security, the circumstances of the estate, and the duration and feasibility of the reorganization plan. *Id.* The determination may be assisted by evidence included in the debtor's bankruptcy filings, such as work history, job stability, cash flow, disposable income, the existence or absence of prior bankruptcy filings, and the contents of the Chapter 13 plan. *See id.; see also Swafford,* 296 B.R. at 69 & n. 4 (enumerating these factors, as well as the length of time for payout, the nature of the debtor's unsecured debts, the current interest rate, the original contract rate, and the circumstances surrounding the negotiation of the loan contract). Under *Till,* the evidentiary burden falls "squarely" on the secured creditor to establish the need for an interest rate higher than the one proposed by the Chapter 13 debtor. *Till,* 541 U.S. at ——, 124 S.Ct. at 1961; *Baxter v. Berksteiner (In re Berksteiner),* No. 03–13203, 03–13645, 03–13765, 03–13242, 2004 WL 2201300, at *2 (Bankr.S.D.Ga. Sept.9, 2004) (*citing Till*).

## 2. Risk of Default

▮▮▮▮▮ Applying the formula approach to the matter at bar, the Court begins with the relevant national prime rate of 4.75%.[7] This rate "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Till,* 541 U.S. at ——, 124 S.Ct. at 1961. To the prime rate, the Court must add a risk factor interest premium so that the discount rate is high enough to compensate the secured creditor for its risk "but not so high as to doom the plan." *Id.* at 1962. Bivens' Amended Plan provides for a risk factor interest premium of 2.25%, the difference between the proposed rate of 7% and the national prime rate of 4.75%.[8] In contrast, Nuvell urges the Court to apply a premium of 14.2%, the difference between the Contract rate of 18.95% and the prime rate. The Court concludes that Nuvell has not met its burden of establishing the propriety of the substantially higher risk premium that it urges; such a premium would make the Amended Plan unfeasible and

---

7. The national prime rate is the lowest loan rate offered by commercial banks to their most creditworthy customers. *Till,* 541 U.S. at ——, 124 S.Ct. at 1957; *Koopmans,* 102 F.3d at 875; *Scott,* 248 B.R. at 793. The prime rate of 4.75%, effective September 22, 2004, reflects the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." Ex. 8.

8. Nuvell notes that the prime rate itself includes a risk component of approximately 1.5%. Thus, Bivens' Amended Plan effectively proposes a total risk premium of 3.75% in additional interest to compensate Nuvell in the event of default.

effectively negate the projected dividend to unsecured claimants, including Nuvell, whose claim includes an unsecured component.

To determine the appropriate risk premium, the Court examines the relevant considerations of the case. *Onyx Acceptance Corp.*, 2002 WL 908714, at *2. Bivens lives in Chicago with her two dependent children, ages four and seventeen. Amended Plan. She works as a revenue clerk at Community Mental Health Council, a job she has maintained for the last four years. Ex. 14, Sch. I. Bivens earns approximately $25,000.00 annually. *See id.* After deductions for taxes, her monthly take-home pay is $1,789.67. *Id.* Her husband, from whom she is currently separated, provides Bivens with $200.00 per month for child support, bringing her total monthly income to $1,989.67. *Id.* After deducting $1,664.00 for monthly expenses, Bivens projects a budget of $325.00 per month with which to pay debts. Ex. 15, Sch. J. She has voluntarily submitted to the Chapter 13 trustee that portion of her earnings through court-ordered payroll deductions. At trial, Bivens testified that separation from her husband produced a temporary reduction in her income, precipitating the filing of this case, but that she is now managing on her tight budget and needs the Vehicle to make her Amended Plan work. She also offered to extend the term of her Amended Plan to sixty months, the maximum permitted by § 1322(d),[9] to show her continued good faith efforts to pay her creditors.

Despite Bivens' assertions that she will be "able to live according to the budget under the [Amended] Plan," Nuvell contends that Bivens "presents a high risk of default" and insists that nothing short of the Contract rate of 18.95% will adequately compensate Nuvell for its exposure. In support of this contention, Nuvell points to Bivens' poor credit history with Nuvell; alleges that Bivens has been unable to obtain a loan at a lower rate of interest on the free market; suggests that the prepetition Contract rate is indicative of Bivens' risk of default; and asserts that, generally, 60% of Chapter 13 plans fail, necessitating a significant initial risk adjustment in all cases.

Before addressing each of these contentions, the Court acknowledges that Bivens' bankruptcy filing establishes that she was overextended and probably poses a higher risk of default that those who have not had a need to find refuge under the Code. *See Till*, 541 U.S. at ——, 124 S.Ct. at 1959. However, as Justice Stevens somewhat cryptically opined for the *Till* plurality, "the postbankruptcy obligor is no longer the individual debtor but the court-supervised estate, and the risk of default is thus somewhat reduced." *Id.* Further, the possibility of default is significantly decreased because Bivens must "provide for the submission" to the trustee "of all or such portion of [her] future ... income ... as is necessary for the execution of the [Amended] [P]lan." 11 U.S.C. § 1322(a)(1). In addition, the exhaustive disclosure requirements under the Code reduce the risk that Bivens has substantial undisclosed obligations. *See Till*, 541 U.S. at ——, 124 S.Ct. at 1959. Finally, "the public nature of the bankruptcy proceeding is likely to reduce [Bivens'] opportunities to take on additional debt." *See id.* Turning to Nuvell's specific arguments, its claim that Bivens' high risk of default is

---

**9.** Section 1322(d) provides in its entirety as follows: "The plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years." 11 U.S.C. § 1322(d).

exhibited by her imperfect pre-petition payment history is unconvincing. The Supreme Court has unequivocally noted that in selecting a cram down rate, bankruptcy courts need not consider a creditor's *prior* interactions with a debtor. *Id.* at 1960. Indeed, most Chapter 13 debtors have failed to pay one or more of their pre-petition debts; those defaults are what lead them to file in the first place. Instead, post-petition payments are more indicative of whether or not Chapter 13 debtors will likely perform as they have proposed under their plans.

Bivens does not dispute that her pre-petition payment record with Nuvell has been less than stellar. However, as discussed above, it is her post-petition payment activity that is germane to the Court's analysis—not her credit history with Nuvell. Bivens acknowledges that she will be living on a very tight budget over the life of the Amended Plan. Nevertheless, at the time of the evidentiary hearing, five months into the plan, Bivens was staying within budget, and she testified that she has been able to "make ends meet." Moreover, the most important risk factors weigh strongly in her favor: She is employed, has maintained the same job for four years without disturbance or disruption, and regularly receives support payments from her husband. Finally, she is on payroll control, the greatest and most pragmatic mechanism for insuring successful consummation of a Chapter 13 plan. *See, e.g., In re McMillan,* 285 B.R. 480, 485 (Bankr.W.D.Wash.2002) (noting that "income deduction orders are a critical element for a successful Chapter 13 plan").

Next, Nuvell contends that Bivens' inability to offer any documentary proof to show that she has become more creditwor-

thy since signing the Contract or that she has been approved for a loan with a rate of interest lower than 18.95%, *see* Ex. 4 at ¶¶ 13, 14, lends support to its claim that she still poses a high risk of default and that, consequently, the Court should apply the Contract rate of interest. This argument fails as well. The lack of any proof does not mean that Bivens is less creditworthy today than she was upon the signing of the Contract. To the contrary, post-petition Bivens has proven herself more creditworthy by making regular payments for over five months under the Amended Plan and living within her budget. Nor does the absence of documentary proof signify that Bivens was unable to obtain a low-interest loan. Whether or not she could have actually been approved for such a loan, Bivens testified that she never applied for one. Her testimony was credible and demonstrated that, like most unsophisticated car buyers, she found no need to go through the steps necessary to obtain alternate financing when the automobile dealership was providing her with it. Moreover, despite the federal Truth in Lending provisions in the Contract and attempts by Nuvell's counsel to characterize the deal between the parties as negotiated, the circumstances surrounding the transaction reveal Bivens' relative lack of sophistication and experience. She wanted to purchase a replacement vehicle, she was offered the subject financing, and she signed on the proverbial dotted line without seeking less expensive financing alternatives.

██ Nuvell's assertion that the pre-petition Contract rate is indicative of Bivens' risk of default is equally without merit.[10] The Contract rate of 18.95% is

---

10. In an effort to circumvent the *Till* Court's decision that the formula approach is the proper method to use in determining the

cram down interest rate, Nuvell tries to distinguish *Till* from the matter at bar. Specifically, Nuvell makes much ado about the plu-

currently 14.2% above the national prime rate and, accordingly, has no close relation to current economic conditions. *See De-Maggio,* 175 B.R. at 150. Further, various elements are typically built into the contract interest rate charged by creditors, including "the transactional costs of being a lender in a society where all debts are not paid." *Fisher,* 29 B.R. at 544. For example, costs of collection are usually reflected in a creditor's contract rate of interest. *Id.* These should not be included in the context of a Chapter 13 bankruptcy:

> In chapter 13, ... attendant costs of collection such as garnishment, attachment, self-help repossession, and the draw backs of attempting to collect such as racing to the courthouse to garnish a debtor's wages before other [creditors] garnish wages are eliminated. The costs of finding the debtor, obtaining a judgment, ordering him into court to aid in execution, keeping track of the debtor and having little or no control over a judgment-proof debtor (high risk debtor) and little or no means to force payment on a regular basis from someone who does not want to ... or cannot pay are eliminated. There are also no costs of dunning or billing in chapter 13.

*Id.* Similarly, the contract rate often includes costs of administration. Because most of these costs are handled by the trustee, whose fees are paid from the plan payments made by Chapter 13 debtors like Bivens, including other administrative costs in the contract rate would be tantamount to charging the debtor twice, once to pay the trustee and once to pay the creditor. *Id.* at 545. Therefore, all costs of administration must be subtracted from the contract rate. Finally, profit is included in the interest rate charged by creditors. "A creditor profits from the interest it charges. A creditor might charge a higher rate of interest on top of the risk free interest rate to enhance its profit.... [T]he discount rate is not intended to give *any creditor* a profit." *Id.* (emphasis in original); *see also Jones,* 219 B.R. at 509 ("The ... Code protects the creditor's secured interest in the property, not the creditor's interest in profit it had hoped to make on the loan."). Applying a rate of interest that already includes some compensation for the risk of default, *Koopmans,* 102 F.3d at 875, and also reflects costs of collection, administrative expenses, profit, and other elements would result in a windfall for Nuvell to the detriment of unsecured creditors. *See Scott,* 248 B.R. at 793.

Despite these observations, the Court merely surmises that the Contract rate in this matter was composed of the elements set forth above. That is because no officer or other agent of Nuvell testified in support of its claims and objections, and, thus, the Court has no evidence as to how the 18.95% Contract rate was determined or the reasons therefor. More specifically, Nuvell failed to provide any testimony indicating the risk factors upon which it

rality's statement that "there is every reason to think that a properly adjusted prime rate will provide a better estimate of the creditor's current costs and exposure than a contract rate *set in different times.*" *Till,* 541 U.S. at ——, 124 S.Ct. at 1964 (emphasis added). According to Nuvell, the Contract rate in this matter was not set in "different times"; instead, the Contract was signed by Bivens only nine months before her bankruptcy filing. "Since the contract was signed in such close proximity to the Debtor's bankruptcy filing," Nuvell writes, "the contract rate of interest is strong evidence of the Debtor's actual risk of default for purposes of establishing the 'cramdown' interest rate for her Chapter 13 Plan." As the debtors in *Till* filed for relief just over twelve months after executing their retail installment contract, the time frame is very similar to the one in the instant matter. Accordingly, Nuvell's attempt to distinguish *Till* fails.

relies in determining the interest rate required when an individual wishes to buy an automobile. *Contra Collins*, 167 B.R. at 844 (noting that Ford relied on over forty risk factors, including the debtor's length of employment, the age of the vehicle financed, and the amount of the down payment). Similarly, Nuvell failed to present evidence that it is considered a "subprime" lender, providing loans to people whose prior credit problems or lack of positive credit history make them undesirable to "prime lenders." *See Kidd*, 315 F.3d at 673. Nor did Nuvell introduce testimony that the interest rate for a high risk borrower buying a 2000 Chevy Venture either on August 4, 2003 or at the time of trial would be 18.95%. *Contra id.* (citing presented evidence that "the bank rate of interest for a high-risk borrower purchasing a 1996 pickup truck would be 16.25%"). Instead, the only witness to testify at trial was Bivens, who credibly asserted that she did not shop around for more favorable loan terms when she bought the Vehicle. Accordingly, the Court finds that Nuvell has failed to carry its evidentiary burden of proving that the Contract rate—or *any* interest rate higher than the one proposed in Bivens' Amended Plan-is more appropriate.

Finally, Nuvell asserts that a substantial initial risk adjustment must be made in all cases because a great percentage of Chapter 13 plans fail. To bolster this contention, Nuvell cites to a systematic study of seventy-one Chapter 13 cases filed in the U.S. Bankruptcy Court for the Southern District of Mississippi between 1992 and 1998. Scott F. Norberg, *Consumer Bankruptcy's New Clothes: An Empirical Study of Discharge and Debt Collection in Chapter 13*, 7 Am. Bankr.Inst. L.Rev. 415, 427 (1999). Specifically, the study indicates a post-confirmation failure rate of 60%. *See id.* at 440–41.

However, before presenting his findings, the study's author hastens to warn readers that "[c]onsumer bankruptcy practices vary among judicial districts, ... so that this study's findings are not necessarily representative of all districts." *Id.* at 419. Indeed, each bankruptcy court has its own official and unofficial practices and distinct legal customs. *Id.* at 419 n. 10. In short, there is regional differentiation as to how Chapter 13 works. Southern Mississippi in the mid-nineties is markedly different from Northern Illinois in 2004. Thus, the study carries little weight for purposes of this matter as it is remote in both time and distance.

While plan feasibility is extremely difficult to predict, it is axiomatic that the interest rate required on deferred payments can determine the success or failure of a debtor's Chapter 13 plan. *See, e.g., DeMaggio*, 175 B.R. at 146 ("[T]his debtor cannot perform any plan within the requirements of chapter 13 if the 18 percent interest rate is used."). Indeed, based on over sixteen years of experience as a practicing attorney and nearly seventeen years on the bench, the undersigned has observed that individuals who must service debt with double-digit interest rates are more likely to fail than those who have to pay debt with single-digit interest. Moreover, the interest premium of 2.25% proposed under Bivens' Amended Plan falls within the range of 1% to 3% that has been generally approved by other courts. *Till*, 541 U.S. at ——, 124 S.Ct. at 1962; *Valenti*, 105 F.3d at 64 (collecting cases); *Koopmans*, 102 F.3d at 875–77 (affirming a 1.5% enhancement for risk); *DeMaggio*, 175 B.R. at 152 (finding an additional 1% risk increment appropriate); *Fisher*, 29 B.R. at 551 (concluding that "a 1% risk factor is an accurate reflection of the risk inherent in a chapter 13 proceeding in which a creditor takes the steps provided

for under the Code to protect itself"). The Court hastens to note, however, that the 1% to 3% range suggested in *Till* is not necessarily a cap and emphatically rejects a rule of thumb with respect to risk factors to be added to risk-free discount rates. Rather, the issue of the proper risk premium must be made on a case-by-case basis, taking into account the totality of the circumstances.

In the matter at bar, the Court has considered the circumstances of Bivens' estate, the nature of Nuvell's security interest in the Vehicle, and the duration and feasibility of the Amended Plan, which the Chapter 13 trustee has recommended for confirmation. Bivens has voluntarily submitted a portion of her earnings to the trustee to satisfy her debts. She has every incentive to make payments in order to keep the Vehicle that she needs and has proven herself creditworthy over the first five months of the Amended Plan. Further, many of the most significant risk factors strongly favor plan confirmation: Bivens has worked steadily for the past several years, receives regular child support payments from her husband, is on payroll control, and has made all plan payments to date. For all of these reasons, the Court concludes that the proposed interest rate of 7% will fairly compensate Nuvell for any risk factor inherent in Bivens' Amended Plan but is not so high "as to doom the plan." Nuvell has failed to satisfy its burden to establish the need for an interest rate higher than the one proposed by Bivens. To the contrary, the Contract rate urged by Nuvell is " 'eye-popping[ly]' " high, *see Till*, 541 U.S. at ——, 124 S.Ct. at 1962, and not truly related to the risk of post-petition default. Applying such a rate would render Bivens' Amended Plan unfeasible and eviscerate any dividend on unsecured creditors' claims.

## B. Compensation of Costs and Modification of the Automatic Stay

■ Before putting this matter to rest, the Court considers Nuvell's other principal argument in support of the interest rate specified in the Contract: that Bivens' proposed rate of 7% will not adequately compensate Nuvell for the costs that it expects to incur in the event of default. Specifically, Nuvell contends that it will be forced to bear three types of costs if Bivens defaults: (1) depreciation expenses; (2) liquidation costs; and (3) administrative expenses of foreclosure.[11]

The parties agree that the Vehicle is depreciating at the rate of approximately $225.00 per month. Ex. 5 at ¶ 2. Nuvell argues that, as a result of the depreciation, although it will eventually be able to repossess the Vehicle in the event of default, the collateral will be worth significantly less than the remaining balance due. Specifically, Nuvell contends that motions to lift the stay are often continued "at least once" to give debtors an opportunity to cure the default and that "[o]n many occasions," courts allow debtors to defer a default in plan payments to the end of the plan. Nuvell's Brief in Support of Objection and Motion at p. 9. Consequently, Nuvell asserts, creditors "are often delayed by the courts for at least [two] months in repossessing their collateral." *Id.* According to Nuvell, this delay will, thus, result in a depreciation cost of $450.00. Nuvell also claims that, despite Bivens' promise under the Amended Plan to pay "replacement value" upon default, Nuvell will be unable to sell the Vehicle for that amount. Instead, Nuvell asserts that it will receive

---

11. Nuvell's line of argument here mirrors that of the dissent in *Till. See Till*, 541 U.S. at ——–——, 124 S.Ct. at 1968–78 (Scalia, J., dissenting) (endorsing the presumptive contract rate approach).

only the foreclosure value of the Vehicle. Citing a NADA report for May 2004, Nuvell expects a liquidation cost of $2,050.00.

Finally, Nuvell argues that it will be forced to incur administrative costs to lift the automatic stay if Bivens defaults. Specifically, Nuvell contends that it will have to pay counsel $225.00 to move to modify the stay, as well as a filing fee of $150.00. Thus, if only one motion is necessary,[12] Nuvell alleges that it will incur administrative expenses of foreclosure in the amount of $375.00.

The Court does not quarrel with Nuvell's contention that it might incur costs in the event that Bivens defaults. However, for all of the reasons discussed above, the Court has found that Bivens' Amended Plan is feasible. Indeed, the Court cannot confirm a Chapter 13 plan if it does not believe that the debtor can and will comply with the plan. *See* 11 U.S.C. § 1325(a)(6) (noting that the court shall confirm a Chapter 13 plan if "the debtor will be able to make all payments under the plan and to comply with the plan"). "After *Till,* the over-emphasis on the secured [creditor's] risk at the expense of the feasibility of the plan ... is no longer appropriate." *In re Pokrzywinski,* 311 B.R. 846, 850 (Bankr. E.D.Wis.2004).

Nevertheless, the Court knows all too well that, despite feasibility requirements, a debtor's determination to carry a plan through, and the trustee's role in collecting and disbursing payments, plans can and do fail, thereby subjecting creditors to various expenses. Accordingly, in order to minimize any additional costs that Nuvell may incur in the event of default, the Court will enter a "doomsday" or "drop dead" order that will provide for the stay to be lifted if Bivens defaults in two or more plan pay-

ments or allows Nuvell's interest in the Vehicle to become uninsured.

As set forth above, a bankruptcy court must grant relief from the automatic stay under § 362(d)(2) if "(A) the debtor does not have an equity in [the] property; and (B) [the] property is not necessary to an effective reorganization[.]" The parties have stipulated that Bivens has no equity in the Vehicle, Ex. 5 at ¶ 3, thus satisfying the first prong. However, the parties have also agreed that the Vehicle is necessary in order for Bivens to effectively reorganize. *Id.* at ¶ 4. Because both prongs must be satisfied and the second has not been met, Nuvell's request to modify the stay at this time fails under § 362(d)(2).

■ Alternatively, the Court may modify the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" 11 U.S.C. 362(d)(1). In order for a party in interest to prevail under § 362(d)(1), it must establish the following elements: (1) a debt owing from the debtor to the creditor; (2) a security interest held by the creditor that secures the debt at issue; and (3) a decline in the value of the collateral securing the debt, along with the debtor's failure to provide adequate protection of the creditor's interest. *In re Cambridge Woodbridge Apartments, L.L.C.,* 292 B.R. 832, 841 (Bankr.N.D.Ohio 2003). If the secured creditor meets this burden, then the debtor must establish that the creditor is adequately protected. *Id.*

Nuvell's motion seeks relief from the automatic stay because it challenges Bivens' Amended Plan as failing to provide adequate protection. Motion at ¶¶ 19, 20. As such, Nuvell effectively invokes § 362(d)(1) seeking to modify the stay "for

---

12. Nuvell notes that "[o]ften, more than one motion will be necessary for recalcitrant debt-

ors." Nuvell's Brief in Support of Objection and Motion at p. 9.

cause." However, if Bivens makes all payments required under the Amended Plan, then Nuvell's secured claim component will be paid in full, along with 7% interest. Thus, the focus is and remains on Bivens continuing to make her plan payments.

However, in response to Nuvell's legitimate concerns over possible future defaults and the administrative expenses it may be forced to incur as a result, the Court hereby enters a drop dead order which will obviate the potential additional fees and expenses attendant to a renewed motion to lift the automatic stay. The general purpose of a drop dead order in bankruptcy proceedings "is to give the debtor one last chance to rectify [her] situation...." *In re Malmgren*, 277 B.R. 755, 758 (Bankr.E.D.Wis.2002); *see also In re Galvan*, No. 97 C 591, 1998 WL 246015, at *1 (N.D.Ill. Apr.30, 1998); *Standfield*, 152 B.R. at 532. More specifically, the drop dead order to be entered here provides that upon Bivens' failure to make two or more monthly plan payments or upon cancellation or lapse of the insurance on the Vehicle covering Nuvell's interest, the automatic stay protection as to Bivens will be lifted without leave of the Court after fourteen days' notice of the default by Nuvell to Bivens and her attorneys at their respective addresses of record and her failure to cure same within such period. As with virtually all drop dead orders, strict compliance is required. *Malmgren*, 277 B.R. at 758. In accordance with the order, the Court grants Nuvell's motion to modify the automatic stay pursuant to the conditions set forth therein.

## V. *CONCLUSION*

For the foregoing reasons, the Court overrules Nuvell's objection to confirmation of Bivens' Chapter 13 Amended Plan. Nuvell is allowed a secured claim in the amount of $10,872.08, discounted at the rate of 7% to reflect present value, and an unsecured claim in the amount of $3,056.44. Bivens' oral motion to extend the plan term to sixty months is granted. An order of confirmation of Bivens' Amended Plan will be entered in accordance with this Opinion. Nuvell's motion to modify the automatic stay is granted without leave of the Court upon future default in two or more monthly plan payments to be made by Bivens or upon cancellation or lapse of the insurance protecting Nuvell's interest in the Vehicle, after fourteen days' notice of the default by Nuvell to Bivens and her attorneys and her failure to cure any such default within such period.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.